STATE of Wisconsin, Plaintiff-Respondent,

v.

James RANDALL, Defendant-Appellant.

Court of Appeals

*No. 94–1053–CR. Submitted on briefs May 3, 1995.—Decided September 26, 1995.*

(Also reported in 539 N.W.2d 708.)

29

For the defendant-appellant the cause was submitted on the briefs of *John Miller Carroll* of *John Miller Carroll Law Office*, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sharon Ruhly*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. James Randall appeals from a judgment of conviction for first-degree intentional homicide, contrary to § 940.01(1), STATS., and from an order denying postconviction relief.[1] Randall asserts

---

[1] The Hon. Janine P. Geske presided over the trial and issued the judgment. The Hon. Patricia D. McMahon presided over the postconviction motion and issued the order denying relief.

that the trial court erroneously exercised its discretion in denying his motion for a new trial because the State allegedly failed to disclose information on a pending felony prosecution against one of its rebuttal witnesses, thereby foreclosing Randall's opportunity to impeach the witness. We conclude that although the State has an ongoing obligation to a defendant to disclose exculpatory information on the State's witnesses, any failure in this case was harmless error. Accordingly, we affirm.

Stacy Pettigrew was shot and killed on the afternoon of May 18, 1992, on the near north side of the City of Milwaukee. The main issue in the ensuing prosecution and trial was whether Randall was the person who shot Pettigrew. The following undisputed facts were elicited at Randall's trial. Randall and Pettigrew were acquaintances, having met a few months prior to the day of the shooting. On May 18, 1992, Pettigrew, who was heavily intoxicated, pushed his way into Randall's apartment on West Wisconsin Avenue. Jacqueline Fisher, Randall's roommate, roused Randall from his bed. An altercation then ensued between Randall and Pettigrew, with Pettigrew eventually leaving the apartment. Before he left the area, however, Pettigrew threw two bricks into Randall's apartment—one through the front window, and another through the bedroom window. Pettigrew also yelled, "I am going to kill you and that bitch in there, I am going to shoot both of you."

Fisher called the police to report being threatened by Pettigrew. Randall went outside to wait for the police; however, the police never arrived. As Pettigrew walked home, he engaged in another fight, this time with another acquaintance on North 29th Street. Pettigrew eventually made it to his home. Randall,

meanwhile, had left his apartment and made his way to Pettigrew's residence. The evidence of what occurred next is disputed.

Witness Stacy Putzear testified that while sitting on a porch with Pettigrew she saw a man walking down the street wearing a black jacket. Putzear stated that the man had a cane and was "putting shells into a gun" as he walked. Putzear testified that as the man approached, Pettigrew walked down a few porch steps towards the man and said, "Man, you sure are . . . ." She testified that the man fired the gun two times at Pettigrew, that Pettigrew then ran towards the street, and that the man fired the gun again at Pettigrew. Pettigrew fell by the side of a car, and the man walked up to him and fired three more times. Putzear testified that the shooter stood six to seven feet in front of her when he fired at Pettigrew, and that after he finished shooting, the man just walked back down the street in the direction from which he had originally come. Putzear identified Randall as the shooter in a "show-up" an hour after the shooting, and then identified Randall in court during the trial.

Witness Paul Zingen testified that he was asleep in his apartment on the afternoon of May 18, when he was awakened by an argument from the street below. Zingen testified that he put on his glasses, looked out from his second-story window, and witnessed Pettigrew being shot, at a distance of over 100 feet from the site of the shooting. He later identified Randall as the shooter from a "show-up" from across the street. He did not know Randall personally.

Witness Tonya Strong lived in Pettigrew's house and knew both Pettigrew and Randall. She testified that she saw the shooting from her window and that she identified Randall as the shooter in a "show-up" an

hour after the shooting. One final witness, James Putzear, testified both at the show-up and at trial that Randall looked like the shooter, but he was not positive.

Several other witnesses were unsure of Randall's identity as the shooter. An FBI special agent testified that he was on assignment a block and a half away from the scene when the shooting occurred. The agent described the shooter as 5'10" to 6'0" tall, weighing 190 pounds. Randall weighed 270 pounds. The agent did not identify Randall as the shooter in the "show-up," although the agent stated that he only got a glance at the shooter as the shooter walked by him. Witness Kimberly Christen saw the shooting from her sixth-floor apartment across the street. She told the police at the show-up that she did not think that Randall was the shooter. Witness Mari Jackson stated that Randall was much taller than the shooter. Witness Michael Elder testified that he heard shots, saw Pettigrew struggling with the shooter, and that the shooter then walked "right past" Elder. Elder did not identify Randall as the shooter. He stated that the shooter had no facial hair, while Randall did; further, the gunman was shorter than Randall. Witness Susan Pehmoeller also could not identify Randall as the shooter at the "show-up." She stated that Randall was taller than the shooter and that while the shooter may have had a "day's shadow," he did not have a beard.

Randall testified that as he approached Pettigrew's house, Pettigrew ran towards him. Randall testified that he saw something in Pettigrew's hand, and he (Randall) then turned and walked away. He testified that he heard a gunshot, but that he continued home without looking back and that someone else must have shot Pettigrew.

34

While all of the witnesses described the shooter as wearing a black jacket, the police never located any jacket matching the witnesses' descriptions. Fisher allegedly told police that Randall owned a jacket matching the description at one time, but at trial she denied making the statement to police and denied that Randall ever owned such a jacket. Further, she allegedly told police that when Randall left the apartment he was wearing a shirt and jeans; when Randall was seen shortly after the shooting, he was bare-chested and wearing pants.

During rebuttal, the State called Matthew Williams. Williams testified that Randall had given him a shirt and overalls to dispose of immediately after the shooting. Williams testified that he asked Randall why he wanted the clothing disposed of, and Randall told him that it did not concern him. Williams further testified that he hid the clothing in an apartment and that he later recovered the clothing and turned it over to the police. The clothing was admitted into evidence at trial.

Williams testified against Randall on January 14, 1993. On November 9, 1992, Williams had been arrested and charged with attempted armed robbery. One month after Randall's trial, Williams pleaded guilty to the armed robbery charge and was sentenced to 58 months incarceration out of a possible maximum sentence of twenty years. Although Randall had filed a discovery request seeking any exculpatory evidence involving State witnesses, the State never informed Randall about Williams's ongoing prosecution for the armed robbery.

The jury convicted Randall of Pettigrew's homicide, and the trial court sentenced Randall to life imprisonment. Randall later filed a postconviction motion seeking a new trial based upon the fact that the

State had failed to disclose Williams's pending armed robbery prosecution, and that this failure prevented Randall from impeaching Williams's rebuttal testimony. The trial court denied the postconviction motion, ruling that the information on Williams's pending felony prosecution was not in the State's "exclusive" control and that, further, Randall did not establish that the State's failure to disclose the information was prejudicial. Additionally, the trial court found that Williams gave a statement to the police the day of the murder and that his trial testimony "was substantially the same" as this earlier statement to police.

Randall argues on appeal that the trial court erroneously exercised its discretion when it denied his request for a new trial because the undisclosed information on Williams's pending prosecution was material and impeachable evidence that Randall was improperly foreclosed from presenting in his defense. We review an order denying a postconviction motion seeking a new trial under the erroneous exercise of discretion standard. *See Coleman v. State,* 64 Wis. 2d 124, 127, 218 N.W.2d 744, 746 (1974). "The trial court properly exercises its discretion if its determination is made according to accepted legal standards and if it is in accordance with the facts on the record." *State v. Evans,* 187 Wis. 2d 66, 77, 522 N.W.2d 554, 557 (Ct. App. 1994). Although we review the trial court's findings of historical fact under the "clearly erroneous" standard, *see State v. Johnson,* 133 Wis. 2d 207, 216, 395 N.W.2d 176, 181 (1986), we review issues of "constitutional fact," such as the ultimate issue in this case, *de novo. See Evans,* 187 Wis. 2d at 86, 522 N.W.2d at 561.

A defendant has a Sixth Amendment right to cross-examine witnesses; this includes the right to attack or impeach the credibility of the witness by revealing "possible biases, prejudices, or ulterior motives of the witness." *Davis v. Alaska,* 415 U.S. 308, 315-317 (1974). This right is not absolute; however, the trial court retains the ability to limit cross-examination based upon concerns such as repetitive interrogation, obfuscation of the issues, and prejudice. *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

Randall argues that he was foreclosed from effectively cross-examining Williams because the State failed to turn over evidence that allegedly related to Williams's potential bias or ulterior motive in testifying against Randall; that is, that he was facing a pending prosecution in an unrelated felony case at the time of his rebuttal testimony for the State. In essence, Randall intimates that he was unaware of this pending prosecution due to the State's failure to disclose it to him. Accordingly, he was unable to impeach Williams's credibility by arguing the possibility that Williams's testimony was given in exchange for the State's leniency in Williams's pending prosecution.

We first note that the State has an ongoing duty to disclose to the defense exculpatory and inculpatory evidence that the State has in its possession, including evidence that applies only to the credibility of a witness. *See Nelson v. State,* 59 Wis. 2d 474, 479, 208 N.W.2d 410, 412 (1973) (affirmative duty to disclose).

The trial court concluded that evidence of Williams's pending prosecution for armed robbery was a matter of public record, and that it was not within the

37

"exclusive" control of the State. Further, the trial court stated that Randall "could have made a timely search of the public records and discovered Williams's pending charge." We disagree with this portion of the trial court's ruling because it places an intolerable burden on the defense; namely, to continually comb the public records to see if any of the State's witnesses are facing pending criminal charges. The burden should rightly rest with the State to provide such updated information, particularly in light of a specific discovery request for the criminal records of the State's witnesses, as was present in this case.

Nonetheless, we conclude that the State's failure to disclose this information and Randall's resulting inability to impeach Williams's credibility was harmless error in this case. *See Van Arsdall*, 475 U.S. at 684 (improper foreclosure of a defendant's opportunity to impeach a witness for bias is subject to harmless-error analysis). We reach this conclusion for several reasons.

First, as our lengthy factual discussion of the evidence presented at trial discloses, there was very compelling evidence of Randall's guilt apart from Williams's rebuttal testimony. Several witnesses at the scene, including an acquaintance of Randall and the victim, specifically identified Randall as the shooter.

Next, and most importantly, as the trial court found, Williams gave the police a statement about the clothing prior to his arrest in the armed robbery case. His statement, as he first gave it to police, was essentially consistent with his testimony at Randall's trial. Accordingly, Randall's impeachment theory, that Williams's statement was tainted because of the pending armed robbery charge, is "grasping at straws." Additionally, the trial court found there was "no evidence

which supported the contention that the assistant district attorney who prosecuted [Randall's] trial was aware of the pending charge."

Finally, Williams's credibility was already impeached during the prosecution's direct examination of him. The assistant district attorney asked Williams if he had ever been convicted of a crime, to which Williams testified that he had. Hence, the jury was already aware of Williams's past criminal record, and could use that evidence when judging the credibility of his testimony.

Taken in toto, the State's failure to disclose the information on Williams's pending prosecution was harmless error. Even assuming the limited "damaging potential of the cross-examination" on Williams's arrest had been "fully realized," we are confident that the result in this case would be the same. *Van Arsdall,* 475 U.S. at 684. Accordingly, the trial court correctly denied Randall's postconviction motion for a new trial. *See Coleman,* 64 Wis. 2d at 127, 218 N.W.2d at 746 (reviewing court will reverse only upon erroneous exercise of discretion). For the foregoing reasons, we must affirm the judgment and the order.

*By the Court.*—Judgment and order affirmed.