# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2015AP1083-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent, |
| |    v. |
| | Gary Lee Wayerski, |
| |         Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 378 Wis. 2d 739, 905 N.W.2d 843
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | February 7, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 5, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dunn |
|   JUDGE: | William C. Stewart, Jr., and Maureen D. Boyle |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, J. concurs and dissents, joined by ROGGENSACK, C.J. (opinion filed). |
| | KELLY, J. concurs and dissents, (opinion filed). |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Edward J. Hunt* and *Hunt Law Group, S.C.*, Milwaukee. There was an oral argument by *Edward J. Hunt*.

For the plaintiff-respondent, there was a brief filed by *Donald V. Latorraca*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Donald V. Latorraca*.

**2019 WI 11**

No. 2015AP1083-CR
(L.C. No. 2011CF186)

STATE OF WISCONSIN      :      IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Gary Lee Wayerski,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**FEB 7, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Modified and, as modified, affirmed.*

¶1 REBECCA FRANK DALLET, J. Gary Wayerski seeks review of the court of appeals'[1] decision affirming the circuit court's[2] denial of his postconviction motion.

---

[1] State v. Wayerski, No. 2015AP1083-CR, unpublished slip op. (Wis. Ct. App. Oct. 31, 2017).

[2] The Honorable William C. Stewart, Jr., of the Dunn County Circuit Court presided over the jury trial and entered the judgment of conviction. The Honorable Maureen D. Boyle presided over the postconviction hearings and entered the order denying Wayerski's postconviction motion.

¶2 Wayerski was charged with and convicted of 16 felonies based upon allegations that over several months he had repeated sexual contact with two juveniles, J.H. and J.P., and exposed them to pornography. Wayerski was found guilty by a jury of the following crimes: (1) two counts of child enticement in violation of Wis. Stat. § 948.07(3)(2015-16);[3] (2) two counts of exposing genitals or pubic area in violation of Wis. Stat. § 948.10(1); (3) two counts of exposing a child to harmful material in violation of Wis. Stat. § 948.11(2)(a); (4) two counts of causing a child over the age of 13 to view/listen to sexual activity in violation of Wis. Stat. § 948.055(2)(b); and (5) eight counts of sexual assault of a child by a person who works or volunteers with children in violation of Wis. Stat. § 948.095(3).

¶3 Wayerski filed a postconviction motion, asserting claims of ineffective assistance of trial counsel, circuit court errors, and a claim that the State violated its Brady[4] obligations. Brady v. Maryland, 373 U.S. 83 (1963). The circuit court denied Wayerski's postconviction motion.

---

[3] Wayerski committed and was charged with the offenses when the 2009-10 statutes were in effect. The portions of the statutes relevant to this appeal are materially unchanged from the current 2015-16 version and therefore all subsequent references to the Wisconsin Statutes are to the 2015-16 version.

[4] Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), suppression by the State of material evidence favorable to a defendant violates due process.

2

¶4  The court of appeals affirmed the circuit court's denial of Wayerski's postconviction motion.[5]  Wayerski now seeks review of the denial of his ineffective assistance of counsel claim[6] and the denial of his Brady claim.

¶5  Wayerski claims that his trial counsel was ineffective for failing to question him about a purported confession that he gave to John Clark, a government witness who testified on rebuttal.  We assume without deciding that trial counsel's performance was deficient, in accordance with the first prong of the ineffective assistance of counsel analysis.  However, even if trial counsel's performance was deficient, we conclude that there was no prejudice to Wayerski under the second prong of the analysis.  Thus, we conclude there was no ineffective assistance of counsel.

¶6  Wayerski also alleges that the State violated his due process rights under Brady when it failed to disclose impeachment evidence about Clark's pending charges in Chippewa County.  We conclude that there was no Brady violation.  While evidence of Clark's pending charges was favorable to Wayerski as impeachment of Clark's testimony and the State suppressed the

---

[5] The court of appeals remanded the matter to the circuit court solely to correct an error in the judgment of conviction. Wayerski, No. 2015AP1083-CR, ¶2 n.5.

[6] At the court of appeals Wayerski's ineffective assistance of counsel claim had two parts. Wayerski's ineffective assistance of counsel claim as it relates to his trial counsel's failure to seek a mistrial in response to the admission of pornographic materials is not before us.

evidence, Wayerski failed to show that the evidence was material.    In analyzing whether the State suppressed evidence under the second component of the Brady analysis, we return to the principles of Brady and ask only whether the evidence was suppressed by the State, rather than the revisionary version of Brady that our court has adopted in the past.    Therefore, we modify and, as modified, affirm the decision of the court of appeals.

## I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶7    In July 2011, the State filed a criminal complaint against Wayerski, which charged nine felony counts. In September 2012, the State was granted leave to file a second amended information which charged 16 felony counts.

¶8    The allegations against Wayerski are summarized as follows.    In February 2011, Wayerski, who was the police chief of the Village of Wheeler and a part-time police officer for the Village of Boyceville, offered to act as a "mentor" to 16-year-old J.P. after J.P. admitted to breaking into a church.

¶9    Wayerski began his "mentorship" with J.P. by taking him on "ride-alongs" in his squad car and talking to him about his sexual experiences.    Wayerski invited J.P. to his apartment where he had J.P. take off his shirt and pants so that Wayerski could see his "muscle tone" and assist in his physical fitness. During subsequent visits Wayerski touched J.P.'s genitals, claiming that it was also for workout purposes.

¶10 Between March 2011 and July 16, 2011, J.P. alleged that Wayerski masturbated him on more than 20 occasions while they

4

watched pornography. J.P. also claimed that Wayerski made him perform other sexual activities based on Wayerski's sexual interests and fetishes. One night in particular, Wayerski made J.P. ejaculate onto an oval-shaped turquoise plate so that Wayerski could "weigh his sperm."

¶11 In March 2011, Wayerski issued 17-year-old J.H. a disorderly conduct ticket. Wayerski told J.H. that if he completed his community service and stayed out of trouble for six months, the incident would be removed from his record. Like J.P., J.H. recounted going on several "ride-alongs" in Wayerski's squad car before being invited to Wayerski's apartment. Wayerski also offered to help J.H. improve his physical fitness. J.H. described specific sexual activities that Wayerski made him perform, based on Wayerski's sexual interests, including watching pornography with Wayerski while Wayerski masturbated him.

¶12 Additionally, the juveniles detailed how, on occasion, Wayerski would invite both of them to his apartment at the same time for overnight stays. During these overnight stays, Wayerski would allow the juveniles to drink alcohol. The juveniles also claimed that during one of these overnight stays Wayerski simultaneously masturbated both of them while they watched on-demand pornography together. Lastly, the juveniles alleged that Wayerski threatened to send them to "juvie" or jail if they ever told anyone about the sexual contact or about watching pornography at Wayerski's apartment.

¶13 Early in the morning on July 16, 2011, after staying overnight at Wayerski's apartment, the juveniles got into an argument with Wayerski about his cable bill and the amount of money spent watching on-demand pornography. The juveniles left Wayerski's apartment on foot and walked several miles to a friend's house. When J.H.'s father picked the juveniles up from their friend's house, they told him that some "weird stuff had been happening for a while" at Wayerski's apartment, and that Wayerski had "molested" them. J.H.'s father stated that he could tell the juveniles had been drinking alcohol. Later that day, the juveniles went to law enforcement to report their allegations.

¶14 Eau Claire County[7] Sheriff's Detective Kuehn interviewed J.P. and J.H. separately. Detective Kuehn obtained and executed a search warrant for Wayerski's apartment. Detective Kuehn recovered the following items: multiple computers, alcohol, the oval-shaped turquoise plate that J.P. referenced, and a cable bill containing charges for on-demand pornographic films.

¶15 Wayerski's jury trial lasted from October 8 to October 12, 2012. The State called J.H. and J.P. as its primary witnesses. In addition, the State called the parents of J.H. and J.P. to corroborate the juveniles' story about their

---

[7] To avoid a conflict of interest because of Wayerski's position as a police officer and police chief in villages in Dunn County, the case was assigned to Eau Claire County.

frequent contact with Wayerski and their overnight stays at his apartment. The jury also heard testimony from Sarah Zastrow-Arkens, a DNA analyst from the Wisconsin State Crime Laboratory. Arkens testified that semen from the oval-shaped turquoise plate in Wayerski's apartment showed a male profile which matched J.P.'s DNA. Arkens further testified that the statistical likelihood that the sample from the plate belonged to anyone other than J.P. was one in 28 quintillion. Detective Kuehn testified that he interviewed the juveniles and their demeanor was consistent with prior victims of sexual assault. Additionally, several other law enforcement officers testified about their involvement in the case.

¶16 Wayerski's general defense was that the juveniles had fabricated the allegations because Wayerski was part of a drug investigation involving people connected with J.P. and J.H. Wayerski disputed the number of "ride-alongs" he had with J.P. and J.H. and the number of times the juveniles visited his apartment. Wayerski called four witnesses at trial who claimed that after Wayerski's arrest, J.P. said he was lying and that the allegations were a "set up" or a joke.

¶17 Clark, an inmate who occupied a Chippewa County jail cell near Wayerski for six to eight weeks, testified for the State on rebuttal. Clark testified that Wayerski had admitted to masturbating the juveniles, watching pornography with the juveniles, and allowing the juveniles to drink alcohol. Clark testified that he did not ask for, or receive, any benefit for testifying against Wayerski. Instead, Clark testified that he

had reported the comments to a sergeant at the jail and to Detective Kuehn because "[t]hey're kids. I think that says it all." On the stand, Clark admitted to the jury that he had been convicted of 20 crimes, including some felonies.

¶18 Wayerski's trial counsel recalled Wayerski to the stand after Clark's rebuttal testimony. However, trial counsel did not ask Wayerski about the purported confession. Instead, trial counsel asked several questions that Wayerski insisted he ask, including the number of inmates in jail that Wayerski had been in contact with and whether inmates had access to the media.[8]

¶19 The jury saw a substantial amount of evidence, including pornographic photographs from Wayerski's computer, pornography searches, photos of J.H. and J.P. that Wayerski captured on his phone, and messages from Wayerski's computer and cellphone. The pornographic materials on Wayerski's computer reflected an interest in young males between the ages of 16 and 20 and included pictures arranged under titles labelled "milking," "punish," "spanking," and "stances." At trial, Wayerski admitted to these types of sexual interests. In both their trial testimony and in their initial interview with Detective Kuehn, J.P. and J.H. described contact consistent with these types of sexual interests.

---

[8] The questions asked by Wayerski's trial counsel raised an implication that Clark had access to various forms of media when he was in jail, and that the details he knew about Wayerski's case could have come from those outside sources.

8

¶20 A jury found Wayerski guilty of all 16 felony counts and he was subsequently sentenced to a total of 14 years of initial confinement and 16 years of extended supervision. After his trial, Wayerski discovered that Clark had been charged with three crimes against children in Chippewa County one month prior to Wayerski's trial: (1) one count of soliciting a child in violation of Wis. Stat. § 948.08; and (2) two counts of sexual intercourse with a child 16 or older in violation of Wis. Stat. § 948.09.[9] The prosecutor assigned to Wayerski's case admitted that he had discovered Clark's pending charges a few days prior to Wayerski's trial through a basic check of Consolidated Court Automation Programs (CCAP).[10] After discovering these charges, the prosecutor obtained a copy of the Chippewa County complaint[11] and, after reviewing it, decided that Clark's pending charges did not affect the veracity of his prior statements given to Detective Kuehn. Therefore, the prosecutor did not disclose the pending charges or criminal complaint to Wayerski's trial counsel.

---

[9] Clark was ultimately convicted of: (1) one count of causing a child over the age of 13 to view/listen to sexual activity in violation of Wis. Stat. § 948.055(1); and (2) two counts of sexual intercourse with a child 16 or older in violation of Wis. Stat. § 948.09.

[10] CCAP is an internet accessible case management system provided by Wisconsin Circuit Court Access program. State v. Bonds, 2006 WI 83, ¶6, 292 Wis. 2d 344, 717 N.W.2d 133.

[11] The record is unclear as to exactly how the prosecutor obtained a copy of the complaint.

¶21 Wayerski filed a postconviction motion asserting claims of ineffective assistance of trial counsel, circuit court errors, and a claim that the State violated its Brady obligations by not disclosing Clark's pending charges. The circuit court held a hearing on Wayerski's postconviction motion and heard testimony from Wayerski and his trial counsel.

¶22 As to the claim of ineffective assistance of counsel that is before this court, Wayerski's trial counsel testified that he could not think of a reason why he did not ask Wayerski about Clark's testimony regarding a purported confession. Wayerski's trial counsel admitted that, with "the benefit of 20/20 hindsight," he should have asked Wayerski about the alleged confession. However, Wayerski's trial counsel noted that Wayerski had been talking into his ear during the entire trial, and that he had recalled Wayerski to the stand to ask him several questions that Wayerski directed him to ask. Wayerski testified that, had he been asked at trial, he would have denied giving a confession to Clark.

¶23 While the circuit court acknowledged that Wayerski's trial counsel "probably" should have given Wayerski an opportunity to deny Clark's allegations, one more denial by Wayerski would not have changed the outcome of the trial because of the overwhelming amount of evidence. Therefore, the circuit court found that Wayerski had an opportunity to present his defense and that his trial counsel "provided the representation that he was [constitutionally] required to provide."

¶24 Regarding Wayerski's Brady claim, trial counsel testified that he recalled performing a CCAP search on Clark, but that he was probably concentrating on Clark's convictions. Wayerski's trial counsel testified that he could not recall with "one hundred percent specificity" whether he performed any CCAP searches of Clark or whether he relied upon information provided to him by the State.  The circuit court ordered supplemental briefing on several issues and after two more hearings denied Wayerski's motion.

¶25 The circuit court found that the State failed to disclose Clark's pending charges.  However, citing Randall, the circuit court found that the failure to inform Wayerski of the pending charges was harmless error because there was compelling evidence of Wayerski's guilt apart from Clark's testimony, including the juveniles' testimony and the DNA evidence.  State v. Randall, 197 Wis. 2d 29, 539 N.W.2d 708 (Ct. App. 1995). Further, the circuit court noted that the jury had been alerted to Clark's criminal history and that his credibility had been called into question.

¶26 Wayerski filed a notice of appeal on six issues, only two of which he raises on appeal to this court.  The court of appeals affirmed the circuit court's denial of Wayerski's postconviction motion.  See State v. Wayerski, No. 2015AP1083-CR, unpublished slip op., ¶2 (Wis. Ct. App. Oct. 31, 2017).  The court of appeals determined that "Wayerski failed to demonstrate that his trial attorney's assistance prejudiced his defense on the surrebuttal testimony" and that there was no Brady violation

11

because it was not "'an intolerable burden on the defense' to search CCAP for the State witness's available pending charges." See Wayerski, No. 2015AP1083-CR, ¶2.

¶27 As to Wayerski's ineffective assistance of counsel claim, the court of appeals declined to address the deficiency prong of the ineffective assistance of counsel analysis. Instead, the court of appeals analyzed the prejudice prong and concluded that Wayerski failed to show prejudice for several reasons. First, Clark's credibility was already questioned when the jury was alerted to the fact that he was an inmate in jail and that he had been convicted of 20 crimes, including some felonies. Second, the court of appeals noted that there was never any doubt that Wayerski claimed he was innocent. Wayerski also called four witnesses at trial who testified that they heard J.P. recant the allegations. Finally, the court of appeals reasoned that the evidence of Wayerski's guilt was "overwhelming," including: the juveniles' consistent, detailed testimony, the substantial evidence recovered in Wayerski's apartment, and the parents' testimony about time the juveniles spent with Wayerski.

¶28 As to Wayerski's Brady claim, the court of appeals, like the circuit court, looked to the Randall case. Randall, 197 Wis. 2d 29. The court of appeals reasoned that the basis of Randall was to avoid placing an "intolerable burden" on the defense to extensively search for hard-to-secure evidence. Wayerski, No. 2015AP1083-CR, ¶55.

12

¶29 However, the court of appeals noted that at the time Randall was decided, "'comb[ing] the public records' for the criminal record of every witness disclosed before trial entailed a trip to a physical site, usually the courthouse (or courthouses), to sift through potentially vast paper records." Wayerski, No. 2015AP1083-CR, ¶55 (citing Randall, 197 Wis. 2d at 38). The court of appeals reasoned that since Randall, CCAP has "facilitated efficient use of court resources and greater access to court information by the public," allowing wide access to those records via the internet. Id. (quoting State v. Bonds, 2006 WI 83, ¶47, 292 Wis. 2d 344, 717 N.W.2d 133). The court of appeals held that because it was not an intolerable burden on Wayerski's trial counsel to search CCAP for Clark's pending criminal charges, the pending charges were not "suppressed" under Brady.

¶30 In the alternative, the court of appeals held that even if it assumed that the evidence was suppressed, Wayerski failed to show a reasonable probability of a different result had the pending charges been disclosed. Wayerski, No. 2015AP1083-CR, ¶57. The court of appeals concluded that nondisclosure of the record was not prejudicial because Clark was already impeached and there was "very compelling evidence" of guilt even apart from Clark's testimony. Therefore, the charges were not "material" pursuant to Brady.

¶31 Wayerski presents two claims to this court for review: (1) whether trial counsel was ineffective for failing to

question him about a purported confession that he gave to Clark; and (2) whether the State violated its Brady obligation.[12]

## II. STANDARD OF REVIEW

¶32 "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." State v. Balliette, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334 (citing Strickland v. Washington, 466 U.S. 668, 686 (1984)). The same right is guaranteed under Article I, Section 7 of the Wisconsin Constitution. Whether a defendant was denied effective assistance of counsel is a mixed question of fact and law. State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305. The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous. Id. "Whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel is a question of law, which we review de novo." Id. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's

---

[12] On appeal, Wayerski also alleged that there was a violation of the criminal discovery statute, Wis. Stat. § 971.23(1). The court of appeals declined to address this argument because Wayerski had not properly developed the issue. Wayerski, No. 2015AP1083-CR, ¶54 n.9. Wayerski did not raise this issue in his petition for review to this court and therefore we will not address it. See Preisler v. General Cas. Ins. Co., 2014 WI 135, ¶3, 360 Wis. 2d 129, 857 N.W.2d 136 (holding that this court "decline[s] to consider issues not raised in petitions for review").

performance was deficient and that the deficient performance was prejudicial. State v. Breitzman, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 (citing Strickland, 466 U.S. at 687). If the defendant fails to satisfy either prong, we need not consider the other. Id. (citing Strickland, 466 U.S. at 687).

¶33 Whether trial counsel performed deficiently is a question of law we review de novo. Breitzman, 378 Wis. 2d 431, ¶38. To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness." See Thiel, 264 Wis. 2d 571, ¶19.

¶34 Whether any deficient performance was prejudicial is also a question of law we review de novo. See State v. Domke, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364. To establish that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., ¶54 (quoting Strickland, 466 U.S. at 694).

¶35 With respect to Wayerski's Brady claim, we independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous. State v. Lock, 2012 WI App 99, ¶94, 344 Wis. 2d 166, 823 N.W.2d 378. A defendant has a due process right to any favorable evidence "material either to guilt or to punishment" that is in the State's possession, Brady, 373 U.S. at 87, including any evidence which may impeach

15

one of the State's witnesses. Giglio v. United States, 405 U.S. 150, 154 (1972). A Brady violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material. See State v. Harris, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680 N.W.2d 737 (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

¶36 The materiality requirement of Brady is the same as the prejudice prong of the Strickland analysis. See United States v. Bagley, 473 U.S. 667, 682 (1985). Evidence is not material under Brady unless the nondisclosure "was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281.

## III. ANALYSIS

### A. Wayerski's Ineffective Assistance of Counsel Claim

¶37 Wayerski contends that trial counsel performed deficiently because he failed to question Wayerski about giving a purported confession to Clark. Wayerski further asserts that trial counsel's deficient performance was prejudicial because Wayerski's silence, in the eyes of a jury, was tantamount to an admission of guilt.

¶38 We assume without deciding that trial counsel's performance was deficient under the first prong of the ineffective assistance of counsel analysis. However, pursuant to the second prong of the ineffective assistance of counsel

16

analysis, we conclude that there was no prejudice to Wayerski. Therefore, we conclude that there was no ineffective assistance of counsel.

¶39 To establish that his trial counsel's deficient performance was prejudicial, Wayerski must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Domke, 337 Wis. 2d 268, ¶54 (quoting Strickland, 466 U.S. at 694). "We examine the totality of the circumstances to determine whether trial counsel's errors," in the context of Wayerski's entire case, deprived him of a fair trial. Id. When we consider whether Wayerski was prejudiced by his trial counsel's deficient performance, we examine Wayerski's ability to present his defense, the other evidence presented that undermined Clark's credibility, and the overwhelming evidence against Wayerski.

¶40 First, there was never any doubt that Wayerski claimed that he was innocent. Wayerski denied the juveniles' claims on direct and cross-examination. Wayerski called four witnesses to testify in support of his defense that the juveniles set him up because of his involvement in an ongoing drug investigation. The jury had an opportunity to fully consider and reject Wayerski's defense to the allegations.

¶41 Second, Clark's credibility had already been called into question when he testified. The jury heard that Clark had been convicted of 20 crimes, including some felonies. Further,

17

the questions asked by Wayerski's trial counsel called into question whether Clark heard the details of the offenses from Wayerski or from his access to media at the Chippewa County jail.

¶42 Lastly, as the prior courts acknowledged, the evidence against Wayerski was overwhelming. There was detailed, consistent testimony from J.H. and J.P. and testimony from the juveniles' parents corroborating the amount of time the juveniles spent with Wayerski doing "ride-alongs" and at Wayerski's apartment. J.H.'s father also testified about what occurred when he picked the juveniles up from their friend's house on the morning of July 16, 2011. The jury heard testimony from Detective Kuehn who described the juveniles' demeanor as consistent with that of sexual assault victims in prior cases he had investigated. Detective Kuehn also testified about the items recovered from Wayerski's apartment, including the oval-shaped turquoise plate, the cable bill for on-demand pornography, vodka, and the contents of Wayerski's computer. In addition, the jury heard from a DNA analyst who testified that the semen on the oval-shaped turquoise plate matched J.P.'s DNA profile and that the likelihood the sample belonged to anyone other than J.P. was one in 28 quintillion.

¶43 Therefore, we conclude that even if Wayerski's trial counsel's performance was deficient for failure to question him about the purported confession he gave to Clark, the deficiency was not prejudicial, and thus there was no ineffective assistance of counsel.

18

B. Wayerski's <u>Brady</u> Claim

¶44 Wayerski additionally seeks review of the denial of his <u>Brady</u> claim. We conclude that the evidence was favorable to Wayerski, satisfying the first component of the <u>Brady</u> analysis. We conclude that the State suppressed the evidence under the second component of the <u>Brady</u> analysis. We renounce and reject judicially created limitations on the second <u>Brady</u> component that find evidence is suppressed only where: (1) the evidence was in the State's "exclusive possession and control"; (2) trial counsel could not have obtained the evidence through the exercise of "reasonable diligence"; or (3) it was an "intolerable burden" for trial counsel to obtain the evidence. Finally, we conclude there was no <u>Brady</u> violation because Wayerski failed to demonstrate that the evidence was material, the final component of the <u>Brady</u> analysis.

1. The Evidence Was Favorable to Wayerski

¶45 Applying the first component of the <u>Brady</u> analysis, the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching. <u>See</u> <u>Harris</u>, 272 Wis. 2d 80, ¶15 (citing <u>Strickler</u>, 527 U.S. at 281-82). The State concedes that evidence of Clark's pending charges was favorable to Wayerski to impeach Clark. We agree and accept the State's concession.

2. The Evidence Was Suppressed by the State

¶46 Turning to the application of the second <u>Brady</u> component, Wayerski must demonstrate that the evidence was suppressed by the State, either willfully or inadvertently. <u>Id.</u>

19

The State argues that it did not suppress evidence of Clark's pending charges for the following reasons, which we reject in turn: (1) the evidence was not in the "exclusive possession and control" of the State; (2) Wayerski's trial counsel could have exercised "reasonable diligence" to obtain the evidence; and (3) there was no "intolerable burden" on Wayerski's trial counsel to obtain the evidence himself. We apply the principles espoused in Brady and its progeny and conclude that the State suppressed evidence of Clark's pending charges, including the Chippewa County criminal complaint.

a. Exclusive Possession and Control

¶47 The State argues that for evidence to be suppressed under Brady, the evidence must be within the "exclusive possession and control" of the State. See State v. Sarinske, 91 Wis. 2d 14, 280 N.W.2d 725 (1979); State v. Amundson, 69 Wis. 2d 554, 230 N.W.2d 775 (1975). This "exclusive possession and control" limitation is rooted in Justice Fortas' concurrence in Giles: "[i]f [the State] has in its exclusive possession specific, concrete evidence which is not merely cumulative or embellishing and which may exonerate the defendant or be of material importance . . . the State is obliged to bring it to the attention of the court and the defense." Giles v. Maryland, 386 U.S. 66, 100-102 (1967) (Fortas, J., concurring). "Exclusive possession" is not defined in Giles, nor is there any

20

related analysis.   Id.   It is noteworthy that Justice Fortas never mentions "control" in his concurrence.[13]   Id.

¶48 Wisconsin courts first applied the concept of exclusive possession to the Brady analysis in Cole.   State v. Cole, 50 Wis. 2d 449, 184 N.W.2d 75 (1971).   The Cole court held that information known to the defense regarding the type of car and gun involved in the defendant's arrest was not within the "exclusive possession" of the State, and therefore the State did not suppress the information.   Id. at 457.   Thereafter, this court limited the State's duty to disclose to include only favorable, material information within the State's "exclusive possession or control."   Nelson v. State, 59 Wis. 2d 474, 479, 208 N.W.2d 410 (1973).   The Nelson court did not further define the new "exclusive possession or control" limitation nor did the court apply it.[14]

---

[13] For an in-depth discussion on Wisconsin's use of the exclusive possession and control limitation, see Leslie Thayer, The Exclusive Control Requirement:  Striking Another Blow to the Brady Doctrine, 2011 Wis. L. Rev. 1027, 1041-2.

[14] Nelson involved the issue of whether the defendant had an obligation to request exculpatory evidence for Brady to apply. Nelson v. State, 59 Wis. 2d 474, 486, 208 N.W.2d 410 (1973).   In Agurs, the Supreme Court expanded Brady to include an obligation for the State to turn over favorable, material evidence even absent a defendant's request for information. United States v. Agurs, 427 U.S. 97, 107 (1976).

¶49 Post-Nelson, Wisconsin courts have applied an "exclusive possession and control"[15] limitation to the Brady suppression component. In analyzing whether evidence is in the "exclusive possession and control" of the State, the courts have shifted the focus away from the State's obligation to turn over favorable evidence to whether the defense should have or could have obtained the withheld evidence. See, e.g., Sarinske, 91 Wis. 2d 14 (holding that information regarding a car's short circuit was not in the State's exclusive control where a witness with that information was available to the defense, who failed to question the witness); Amundson, 69 Wis. 2d 554 (holding that a report withheld by the State was not in its "exclusive possession and control" where the author of the report was called as a defense witness); State v. Calhoun, 67 Wis. 2d 204, 226 N.W.2d 504 (1975)(holding that summaries of witnesses' statements to police withheld by the State were not within the State's "exclusive possession and control" because those witnesses were available for questioning by the defense). Wisconsin is the only state to apply this "exclusive possession and control" limitation to the second component of Brady.

---

[15] The language of the limitation varies from "exclusive possession" in Calhoun, "exclusive possession and control" in Amundson, and "exclusive control" in Sarinske. See State v. Calhoun, 67 Wis. 2d 204, 226 N.W.2d 504 (1975); State v. Amundson, 69 Wis. 2d 554, 230 N.W.2d 775 (1975); State v. Sarinske, 91 Wis. 2d 14, 280 N.W.2d 725 (1979).

¶50 There is no express support in the United States Supreme Court's Brady jurisprudence for the limitation that only favorable, material evidence in the "exclusive possession and control" of the State must be turned over to satisfy the due process obligations enunciated in Brady.[16] This limitation further thwarts the purpose of the State's obligation under Brady: to prevent the State from withholding favorable, material evidence that "helps shape a trial that bears heavily on the defendant" and "casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice." Brady, 373 U.S. at 87-88. We hereby overrule the holding set forth in Nelson, 59 Wis. 2d 474, and its progeny that favorable, material evidence is only suppressed under Brady where the withheld evidence is in the State's "exclusive possession and control."

b. Reasonable Diligence

¶51 The court of appeals and the State also rely upon a Seventh Circuit case for the proposition that evidence is not suppressed by the State under the second component of Brady when it is available to the defendant "through the exercise of

---

[16] A 1986 Wisconsin "Opinion of the Attorney General" states that "[n]either the Giles plurality nor the Brady majority mentions the [S]tate's exclusive possession of exculpatory evidence as the controlling factor. Rather, both Brady and Giles characterize materiality as the criterion triggering the duty to disclose exculpatory evidence." 75 Wis. Op. Att'y Gen. 62, 66 (1986).

23

reasonable diligence." <u>Carvajal v. Dominguez</u>, 542 F.3d 561, 567 (7th Cir. 2008).[17] Federal courts are currently divided as to whether a defendant's ability to acquire favorable, material evidence through "reasonable diligence" or "due diligence" forecloses a <u>Brady</u> claim. Although half of the federal courts of appeals have affirmed application of the "reasonable diligence" or "due diligence" limitation,[18] the other half of federal courts of appeals have determined that the "reasonable diligence" and "due diligence" limitations are not doctrinally supported and undermine the purpose of <u>Brady</u>.[19] The United

---

[17] In <u>Carvajal</u>, the Seventh Circuit held that because several officers were available to be questioned about their possibly differing accounts of events, the defendant did not exercise "reasonable diligence," and therefore there was no suppression under <u>Brady</u>. <u>Carvajal v. Dominguez</u>, 542 F.3d 561, 567 (7th Cir. 2008).

[18] <u>See, e.g.</u>, <u>United States v. Parker</u>, 790 F.3d 550, 561-62 (4th Cir. 2015); <u>United States v. Roy</u>, 781 F.3d 416, 421 (8th Cir. 2015); <u>United States v. Brown</u>, 650 F.3d 581, 588 (5th Cir. 2011); <u>Ellsworth v. Warden</u>, 333 F.3d 1, 6 (1st Cir. 2003)(en banc).

[19] <u>See, e.g.</u>, <u>Dennis v. Secretary, Pennsylvania Dep't of Corr.</u>, 834 F.3d 263, 292 (3rd Cir. 2016)(en banc)("[o]nly when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense"); <u>Lewis v. Connecticut Comm'r of Corr.</u>, 790 F.3d 109, 121-22 (2d Cir. 2015)("a due diligence requirement plainly violate[s] clearly established federal law under <u>Brady</u> and its progeny"); <u>United States v. Tavera</u>, 719 F.3d 705 (6th Cir. 2013); <u>United States v. Howell</u>, 231 F.3d 615, 625 (9th Cir. 2000); <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1517 (10th Cir. 1995)("the prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge. 'If the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it
(continued)

24

States Supreme Court has yet to opine whether this limitation on the suppression component of the <u>Brady</u> analysis is appropriate. This court has never analyzed a <u>Brady</u> claim through the lens of "reasonable diligence" and we decline to adopt that requirement now, due to its lack of grounding in <u>Brady</u> or other United States Supreme Court precedent.

### c. Intolerable Burden

¶52 Lastly, the court of appeals, citing to <u>Randall</u>, imposed an "intolerable burden" standard: for favorable, material evidence to be suppressed under <u>Brady</u> it must be an "intolerable burden" for the defense to obtain the information. <u>Randall</u>, 197 Wis. 2d 29. In <u>Randall</u>, the court of appeals held that the defendant's Sixth Amendment rights were violated where the State failed to disclose a witness's pending charges even though the charges were "a matter of public record" and therefore not in the "exclusive control" of the State. <u>Id.</u> at 37-38. The court of appeals explained:

> [I]t places an intolerable burden on the defense; namely, to continually comb the public records to see if any of the State's witnesses are facing pending criminal charges. The burden should rightly rest with the State to provide such updated information, particularly in light of a specific discovery request for the criminal records of the State's witnesses, as was present in this case.

---

to defense counsel . . . .'" (quoted source omitted)). <u>See also</u> <u>In re Sealed Case No. 99-3096 (Brady Obligations)</u>, 185 F.3d 887, 896 (D.C. Cir. 1999)(rejecting the State's argument that there was no <u>Brady</u> violation because information was available to the defense through "reasonable pre-trial preparation").

Id. at 38. The Randall court acknowledged that the State has "an ongoing duty to disclose to the defense exculpatory and inculpatory evidence that the State has in its possession, including evidence that applies only to the credibility of a witness." Id. at 37.[20]

¶53 Here, the court of appeals reasoned that "there is little doubt that it is not 'an intolerable burden' for the defense to obtain information on a witness's pending criminal charges" due to the availability of CCAP. Wayerski, No. 2015AP1083-CR, ¶56. Because Clark's pending charges were available for Wayerski's trial counsel to see on CCAP, the court of appeals reasoned that the information was not "suppressed" under Brady.[21]

¶54 The court of appeals improperly applied the "intolerable burden" standard from Randall to determine whether the State had suppressed evidence under the second component of Brady. As the State conceded in its brief, neither this court nor the United States Supreme Court has used an "intolerable

---

[20] Notwithstanding, the Randall court concluded that the failure to disclose the witness's pending prosecution was harmless error because the evidence of the defendant's guilt was "very compelling," the witness was arrested and charged after he offered to testify, and the witness was impeached at trial when he admitted that he had a criminal record. State v. Randall, 197 Wis. 2d 29, 38-39, 539 N.W.2d 708 (Ct. App. 1995).

[21] The court of appeals did not address the issue of suppression of the Chippewa County criminal complaint, a document in the State's possession and not available to the defense on CCAP.

26

burden" standard when assessing whether a Brady violation has occurred. We overrule Randall, 197 Wis. 2d 29, to the extent that it requires an "intolerable burden" on the defense as a prerequisite to a Brady violation.

¶55 The United States Supreme Court has underscored the special responsibility of the prosecutor in the search for truth in a criminal trial. See, e.g., Banks v. Dretke, 540 U.S. 668, 696 (2004); Kyles v. Whitley, 514 U.S. 419, 439-40 (1995); Strickler, 527 U.S. at 281. In a more recent case exploring the scope of both the prosecution and the defense's responsibilities in locating exculpatory evidence, the United States Supreme Court stated that: "[a] rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." Banks, 540 U.S. at 696. The "exclusive possession and control," "reasonable diligence," and "intolerable burden" limitations distort the original Brady analysis and the purpose behind the prosecutorial obligations enunciated in Brady.

d. The Application of Brady

¶56 We return to the original inquiry under Brady: whether there was "suppression" by the prosecution, irrespective of good or bad faith. Brady, 373 U.S. at 87. The United States Supreme Court has not defined the term "suppression" as set forth in the second component of the Brady analysis. However, the United States Supreme Court has discussed suppression in terms of withholding evidence. Id. ("A prosecution that withholds evidence on demand of an accused which, if made

27

available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant."); see also Cone v. Bell, 556 U.S. 449, 469 (2009) ("when the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process"); Kyles, 514 U.S. at 451 ("assessing the significance of the evidence withheld").

¶57 The United States Supreme Court has also discussed suppression in terms of the nondisclosure of evidence. See Cone, 556 U.S. at 470 ("favorable evidence is subject to constitutionally mandated disclosure"); Banks, 540 U.S. at 693 (referring to "Brady disclosure obligations"); Kyles, 514 U.S. at 441 ("disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); Strickler, 527 U.S. at 281 ("'Brady violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence"); U.S. v. Agurs, 427 U.S. 97, 108 (1976)(referring to the obligation under Brady as a prosecutor's "constitutional duty of disclosure").

¶58 Therefore, pursuant to the United States Supreme Court's Brady jurisprudence, suppression is nondisclosure or the withholding of evidence from the defense.  The prosecutor's mindset or 'passivity' is irrelevant to this suppression inquiry.  As the United States Supreme Court has reasoned, "the prudent prosecutor will resolve doubtful questions in favor of disclosure," Agurs, 427 U.S. at 108, and that "is as it should be.  Such disclosure will serve to justify trust in the

28

prosecutor . . . [a]nd it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." Kyles, 514 U.S. at 439-40.

¶59 Applying Brady and its progeny to Wayerski's claim, the prosecutor suppressed evidence of Clark's pending charges, including the Chippewa County criminal complaint, when he failed to disclose the information to Wayerski's trial counsel. The prosecutor not only withheld information regarding Clark's pending charges from Wayerski's trial counsel, which he learned of just days before trial, he also withheld the criminal complaint, which he was able to quickly obtain prior to Wayerski's trial.[22] While the pending charges were posted on CCAP at some point within the month prior to Wayerski's trial, the criminal complaint was not.[23] If Wayerski's trial counsel had discovered the pending charges, he would have had to take extra steps to promptly secure the complaint from Chippewa County.

¶60 In this case, the prosecutor's private deliberations on whether to disclose the evidence of Clark's pending charges

---

[22] There is no record as to how the prosecutor obtained the Chippewa County criminal complaint. However, one thing is certain, he did not obtain it via a public CCAP search, as the concurrences seem to allege.

[23] CCAP does not provide public access to criminal complaints, party filings, investigatory materials, and other court documents.

29

became the forum for ascertaining the truth, rather than Wayerski's trial. The State suppressed evidence, in violation of the second component of Brady, when it withheld or failed to disclose evidence of Clark's pending charges, including the Chippewa County criminal complaint.

### 3. The Evidence Was Not Material

¶61 Lastly, in order for the defendant to prevail on the third component of the Brady analysis, the suppressed evidence must be material. See Harris, 272 Wis. 2d 80, ¶15 (citing Strickler, 527 U.S. at 281-82). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Wayerski alleges that the evidence against him at trial did not reach an irreparable tipping point until Clark testified about the purported confession. Wayerski argues that the State gained a strategic advantage because his trial counsel could not impeach Clark about Clark's purported reason for testifying and his potential interest in the outcome of the case.

¶62 We conclude that the suppressed evidence was not material. There is no reasonable probability that, had evidence of Clark's pending charges been disclosed, the result of the proceedings would have been different. As noted above, in its case-in-chief the State provided compelling evidence of Wayerski's guilt. The jury heard consistent, detailed testimony from the juveniles, the juveniles' parents, Detective Kuehn, and an analyst who testified that a DNA sample taken from the plate

30

in Wayerski's apartment showed a one-in-28-quintillion likelihood of belonging to anyone other than J.P. All of this evidence was presented prior to Clark's rebuttal testimony about an alleged jailhouse confession from Wayerski. Further, Clark was impeached with his 20 prior convictions. Therefore, we conclude that Wayerski cannot demonstrate that, had evidence of Clark's pending charges been disclosed, the result of the proceeding would have been different. Since the evidence was not material, Wayerski's Brady claim must fail.

IV. CONCLUSION

¶63 On petition to this court, Wayerski sought review of the denial of his ineffective assistance of counsel claim and the denial of his Brady claim.

¶64 We assume without deciding that Wayerski's trial counsel's performance was deficient. Notwithstanding, we conclude that Wayerski failed to show that his trial counsel's deficient performance was prejudicial. Thus, Wayerski's ineffective assistance of counsel claim fails.

¶65 We conclude that although the evidence of Clark's pending charges was favorable to Wayerski and the State suppressed the evidence, it was not material and therefore there was no Brady violation. Furthermore, in analyzing whether the State suppressed evidence under the second component of the Brady analysis, we return to the principles of Brady and ask only whether the evidence was suppressed by the State. We overrule Nelson, 59 Wis. 2d 474, and its progeny which hold that the State only suppresses favorable, material evidence when the

31

evidence is in the State's "exclusive possession and control." We also overrule Randall, 197 Wis. 2d  29, to the extent that it requires an "intolerable burden" on the defense as a prerequisite to a Brady violation.

*By the Court.*—The decision of the court of appeals is modified and, as modified, affirmed.

¶66 ANNETTE KINGSLAND ZIEGLER, J. *(concurring in part, dissenting in part).* I agree with the result the majority reaches. However, I do not join the majority opinion, but concur and write separately because the majority opinion chooses to upend longstanding legal principles that have served to properly cabin the judicially-created <u>Brady</u> doctrine.[1] Because the majority concludes that there is no prejudice, it need not go further. But inexplicably, it unnecessarily reaches beyond the prejudice issue and proceeds to topple over five decades of <u>Brady</u> law. While the majority claims to "return to the original inquiry under <u>Brady</u>," majority op., ¶56, it does not, and instead departs from the large body of case law that developed the well-rooted doctrine. <u>Brady</u>, a doctrine now 55 years old, should not be so confused or reinvented.

¶67 First, in its claim to "return to the original inquiry under <u>Brady</u>," the majority selectively chooses certain language from <u>Brady</u> and ignores the body of law that has been relied upon in the 55 years since <u>Brady</u>. A <u>Brady</u> violation occurs where: (1) evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence is suppressed by the prosecution willfully or inadvertently; and (3) prejudice resulted. Critically though, courts have consistently concluded that in a <u>Brady</u> context, the prosecution must exclusively possess and control the evidence in order for the prosecution to

---

[1] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

1

have "suppressed," or withheld,[2] <u>Brady</u> evidence. The prosecution does not exclusively possess or control that which is in the public domain. Thus, the prosecution cannot be deemed to have "suppressed" or withheld such evidence. In eschewing any requirement that the prosecution be in "exclusive possession and control" of the subject materials, the majority significantly departs from <u>Brady</u> and 55 years of precedent.

¶68 The majority also fails to heed any consideration to the distinction between <u>Brady</u> and other means of discovery, such as Wis. Stat. § 971.23, which might impose similar production requirements on the prosecution but which may have different penalties for failing to comply. The <u>Brady</u> doctrine must not be conflated with other statutory obligations, open file policies[3] or judicial preference. The prosecution, under <u>Brady</u>, is not required to disclose exculpatory or impeaching evidence that might somehow later be construed as useful to the defense but was otherwise available to the defense. While the majority's preference is that this evidence should have been disclosed, its

---

[2] The word "suppression" used throughout refers to the prosecution withholding evidence from the defense in a manner that precludes the defense from having access to the evidence. It is not to be confused with the judicial remedy of suppression.

[3] While there may be variations to the way prosecutors handle their offices' respective policies, one definition of an "open file policy" is as follows: "A case-specific policy in which prosecutors allow defense counsel to see (but not always to obtain copies of) all the documents in their file relating to the defendant." <u>Open-file discovery</u>, <u>Black's Law Dictionary</u> 1263 (10th ed. 2014). The record does not reflect that in this case an open file policy was in place.

2

disclosure is simply not required under Brady as it was otherwise available to the defense and the public at large. In other words, the defense could have searched CCAP, just as the prosecution did, to discover the evidence's existence. In no way did the prosecution——nor could the prosecution——"suppress" this evidence from the defendant's acquisition as it was otherwise available in the public domain.

¶69 Second, instead of exercising judicial restraint, the majority takes this opportunity to engage in a legal analysis that imparts its unique view of Brady and overrules over 50 years of Wisconsin precedent that interpreted Brady. In taking the liberty to alter Wisconsin's Brady analysis, the majority stretches well beyond what the opinion should have decided. The majority could have started and ended its Brady analysis by concluding that the defendant was not prejudiced. I agree that there was no prejudice by this nondisclosure. An abundance of evidence clearly supports the jury's guilty verdict regardless of the inmate's testimony.

¶70 In my view, however, the majority opinion is an overreach. It is a sea change in the application of Brady unmoored to fundamental limitations that underlie the doctrine. Brady violations occur only where (1) favorable evidence to the defense that is exculpatory or impeaching (2) is willfully or inadvertently suppressed by the prosecution (3) resulting in prejudice. To be a violation, the prosecution must be found to have suppressed, or withheld, evidence of which it had exclusive possession and control. Here, that simply is not the case.

3

I

¶71 I begin with Brady's judicially created history and evolution. The United States Supreme Court first imposed a duty on the prosecution to disclose exculpatory evidence to defendants in Brady v. Maryland, 373 U.S. 83 (1963). In Brady the defendant testified that while he was present when a murder was committed, another person committed the murder. Id. at 84. Prior to trial, defense counsel requested the prosecution allow him to examine the accomplice's out-of-court statements, which had not been disclosed to the defense. Id. The prosecution provided several such statements, but withheld one crucial statement in which the accomplice admitted to being the killer. Id. The defendant was later convicted of first-degree murder and sentenced. Id. Following the verdict, the defense learned of the confession and moved for a new trial based upon the newly discovered evidence that the prosecution suppressed from their discovery. Id.

¶72 In Brady the Supreme Court concluded "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Importantly, the Court emphasized principles of fairness to the defendant and justice, further stating that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair," and that the ultimate end "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused."

4

Id. The Court also expressed its aversion for allowing a prosecutor to be an "architect of a proceeding that does not comport with the standards of justice" by withholding evidence which "would tend to exculpate" the defendant or reduce the defendant's sentence. Id. at 88.

¶73 The Court in Brady however ultimately concluded that the confession would not have exculpated the defendant, but that the confession could have reduced the defendant's sentence. Id. at 88-90. It thus affirmed the court of appeals' remand on the limited issue of sentencing. Id. at 91. While Brady established that favorable, material evidence that should have been revealed to the defense but instead is suppressed by the prosecution could be a due process violation, it left room for the doctrine to be further refined. The Court did not expressly define materiality, establish whether exculpatory evidence was the only sort of evidence that would be deemed favorable under the doctrine, or define under what circumstances evidence is deemed to be suppressed by the prosecution. The result was that case law further developed the parameters of the doctrine.

¶74 In the wake of Brady, courts responded to the need to refine its application and scope. In Giglio v. United States, 405 U.S. 150, 154-55 (1972), the Supreme Court held that in addition to exculpatory evidence, the prosecution is required to disclose favorable, material evidence that could be used to impeach prosecution witnesses. The Court concluded that impeachment evidence includes an agreement with a prosecution witness to testify for favorable treatment in the criminal

justice system. See id. However, as the Court in Brady, the Court in Giglio did not define suppression or materiality, or further clarify the contours of the prosecution's duty to produce evidence under the Brady doctrine.

¶75 In Moore v. Illinois, 408 U.S. 786, 795 (1972), the Court stated that there was "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." The Court confirmed this idea in United States v. Agurs, 427 U.S. 97, 110 & n.16 (1976) (quoting Giles v. Maryland, 386 U.S. 66, 98 (1967) (Fortas, J. concurring) (stating that "convictions ought [not] be reversed on the ground that information [is] merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court")).[4]

¶76 In United States v. Bagley, 473 U.S. 667 (1985), the Court refined materiality under a Brady analysis, stating that evidence is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. It further defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id.

¶77 My interpretation is not novel. Federal courts in every circuit have considered whether the prosecution is deemed to have "suppressed" evidence. Quite simply, the prosecution

---

[4] Similarly, in Kyles v. Whitley, 514 U.S. 419, 437 (1995), the United States Supreme Court declined to use Brady to impose "an open file policy" on the prosecution.

6

cannot suppress something that is available to the public. Courts have repeatedly rejected attempts to extend Brady to evidence that is available to the defense from sources other than the prosecution. See, e.g., United States v. Roy, 781 F.3d 416, 421 (8th Cir. 2015) (Brady not violated where the prosecution withheld information about the victim's lie to law enforcement because the information was a matter of public record in a published opinion of the Supreme Court of Arkansas); United States v. Georgiou, 777 F.3d 125, 140-41 (3d Cir. 2015) (no Brady violation where evidence of witness's mental health history and treatment was publicly available in transcript of plea hearing and defendant knew of the witness's guilty plea); United States v. Catone, 769 F.3d 866, 871-72 (4th Cir. 2014) (Brady not violated where the evidence was available to the public and could have been discovered through diligent investigation); United States v. Smith, 749 F.3d 465, 493 (6th Cir. 2014) (no violation under Brady where prosecution did not disclose two witnesses' exculpatory testimony because the testimony could have been discovered with due diligence); Cunningham v. Wong, 704 F.3d 1143, 1154 (9th Cir. 2013) (no Brady violation occurred despite prosecution's failure to disclose witness's medical records because defense knew that the witness had been shot and could have easily obtained the records); Hooks v. Workman, 689 F.3d 1148, 1180 (10th Cir. 2012) (no Brady violation where prosecution did not fully disclose witness's mental disability because the defense was put on notice by a prosecutor's memo and the defense could have spoken

7

to the witness to obtain further information); <u>Cobb v. Thaler</u>, 682 F.3d 364, 378-79 (5th Cir. 2012) (no <u>Brady</u> violation occurred despite the prosecution's failure to disclose evidence that charges were dropped against witness because defense had access to the information via a co-defendant's open case file); <u>United States v. Hsu</u>, 669 F.3d 112, 117 n.2 (2d Cir. 2012) (noting that exculpatory e-mails and bank records that would have impeached a prosecution witness would not violate <u>Brady</u> because if they existed, the defendant would have been aware of them and could have subpoenaed them); <u>United States v. Celestin</u>, 612 F.3d 14, 22-23 (1st Cir. 2010) (no <u>Brady</u> violation occurred where a defendant knew of his own time and attendance records and had the opportunity to subpoena them); <u>Carvajal v. Dominguez</u>, 542 F.3d 561, 567-69 (7th Cir. 2008) (stating that evidence is suppressed when "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence," and finding no <u>Brady</u> violation where witnesses were available to the defense for questioning); <u>LeCroy v. Sec'y, Fla. Dep't of Corr.</u>, 421 F.3d 1237, 1267-68 (11th Cir. 2005) (no <u>Brady</u> violation where prosecution failed to disclose defendant's own medical and school records because defense could have acquired them by exercising reasonable diligence).[5]

---

[5] Perhaps providing additional context will further an understanding of why federal case law does not otherwise lend support for the majority's interpretation of <u>Brady</u>. Case law demonstrates that when information is publicly available or the
(continued)

defense has notice of its existence, no Brady violation occurs. Of course these cases are dependent on their facts. To cherry pick quotes from any such case, without more, does not do justice to the entirety of the Brady analysis.

First, in Dennis v. Secretary, Pennsylvania Department of Corrections, 834 F.3d 263 (3d Cir. 2016) (en banc), the court concluded that the prosecution violated Brady because it withheld exculpatory physical evidence to which the defense had no access or ability to discover. Id. at 285-96. While the court expressed its distaste for placing a "due diligence" requirement on defendants, the court did not otherwise address what it might have done had the information been in the public domain. Id. at 288-93. Dennis is thus distinguishable from the case we decide today.

Instructively, the United States Court of Appeals for the Third Circuit considered Brady a year earlier in United States v. Georgiou, 777 F.3d 125 (3d Cir. 2015). There, the prosecution failed to disclose a bail report regarding the defendant's co-conspirator, along with the minutes from the co-conspirator's arraignment and guilty plea. Id. at 139. Both the bail report and the minutes contained information regarding the co-conspirator's history of mental health issues and corresponding treatment. Id. The court held that there was no Brady violation regarding evidence of the co-conspirator's mental health history and treatment because the bail report and minutes were equally available to both the prosecution and defense. Id. at 140-41. The court there concluded that the defense "was in 'a position of parity with the government as far as access to this material.'" Id. at 140 (quoting United States v. Jones, 34 F.3d 596, 600 (8th Cir. 1994)). Since both the prosecution and defense had the same access to the evidence, the court held that the bail report and minutes were not suppressed by the prosecution under Brady. Id. at 140-41. Dennis neither mentions nor analyzes Georgiou, presumably because in Dennis the evidence was not in the public domain.

Second, in United States v. Tavera, 719 F.3d 705 (6th Cir. 2013), the court determined the prosecution violated Brady when it withheld exculpatory testimony of a potential witness. Id. at 710-14. Again, this information was available solely to the prosecution and withheld from the defense. Id. at 711-13. It was not otherwise publicly available so the court did not weigh in on that issue. Id. As a result, Tavera is not instructive as to the issue we now address.

(continued)

9

In fact, in United States v. Smith, 749 F.3d 465 (6th Cir. 2014), decided nearly ten months after Tavera, the court concluded that no Brady violation occurred. Id. at 491-92. Evidence that the prosecution acquired by interviewing people the defense had hired was deemed to be readily available to the defense. Id. at 493. In other words, the defense had at least an equal opportunity, if not greater, to interview these potential witnesses. Thus, there was no Brady violation when the prosecution did not turn over the interviews.

Third, in Amado v. Gonzalez, 758 F.3d 1119 (9th Cir. 2014), the court concluded that there was a Brady violation because the prosecution failed to disclose exculpatory impeachment evidence. Id. at 1134-35. At issue was an undisclosed probation report that would have impeached the testimony of a prosecution witness. Id. at 1138. The prosecution had access to the probation report, and the defense did not. See id. at 1135, 1138. There is no indication that the report was otherwise publicly available to the defense. See id. at 1135. The Ninth Circuit addressed the prosecution's burden to produce exculpatory evidence and expressed its aversion towards a stringent "due diligence" requirement on the defense, but seemingly, any diligence of the defense would not have resulted in discovery of this report. See id. at 1136-38; see also Lewis v. Connecticut Comm'r of Corr., 790 F.3d 109, 121-22 (2d Cir. 2015) (Brady violated because prosecution withheld evidence that was not publicly available; however, court noted no Brady violation occurs regarding "facts already within the defendant's purview"); In re Sealed Case No. 99-3096, 185 F.3d 887, 889-91, 897 (D.C. Cir. 1999) (Brady violated where prosecution admitted its failure to search for requested impeaching information that was not otherwise publicly available; Brady not violated regarding prior conviction records that were publicly available).

In Cunningham v. Wong, 704 F.3d 1143 (9th Cir. 2013), the court determined that no Brady violation occurred even though the prosecution failed to supply the defense with an autopsy report of the individual the defendant was alleged to have killed, along with the medical records of an eyewitness the defendant was alleged to have shot. Id. at 1154. The court held that no Brady violation occurred because the defense "possessed the 'salient facts'" that would have enabled it to access the medical records, and because the defense was "obviously aware" that the other individual had been killed and could have easily obtained the autopsy report. Id. Thus, the court held that "[t]here was no suppression of this easily

(continued)

10

attainable evidence." <u>Id.</u> In <u>Cunningham</u>, <u>Brady</u> was not violated even though the exculpatory evidence was not publicly available but was nevertheless deemed to be readily obtainable by the defense. <u>See also</u> <u>United States v. Howell</u>, 231 F.3d 615, 623–27 (9th Cir. 2000) (<u>Brady</u> not violated because defendant not prejudiced by prosecution's suppression of police report errors).

Fourth, in <u>United States v. Quintanilla</u>, 193 F.3d 1139 (10th Cir. 1999), the court considered whether a <u>Brady</u> violation occurred where the prosecution failed to disclose exculpatory testimony obtained in an interview, but where the defense actually knew about the information before trial. <u>Id.</u> at 1149. Prior to her trial, the defendant moved to adjourn because she wanted to obtain exculpatory testimony from a co-defendant whose separate trial was about to occur. <u>Id.</u> at 1143–44. After the district court denied the motion, yet before trial, the other defendant made a statement to law enforcement that was exculpatory for Quintanilla. <u>Id.</u> at 1144. The prosecution obtained that statement, but it did not release it to the defense. <u>Id.</u> The exculpatory statement was not otherwise publicly available. <u>Id.</u> However, because defense counsel had become aware of the statement before law enforcement conducted the interview, the court concluded there was no <u>Brady</u> violation. <u>Id.</u> at 1149. <u>Quintanilla</u> does not address the situation where information is publicly available.

Similarly, in <u>Hooks v. Workman</u>, 689 F.3d 1148 (10th Cir. 2012), no <u>Brady</u> violation occurred even though the prosecution had much more detail about the defendant's mental well-being that was not reflected in the memorandum turned over to the defense. <u>Id.</u> at 1179–80. No <u>Brady</u> violation occurred, however, because the evidence was "made known and available to the defense prior to trial," and "<u>Brady</u> 'does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant.'" <u>Id.</u> Also, "disclosure need not be 'in a specific form or manner.'" <u>Id.</u> at 1180. The court had no difficulty concluding that the prosecution fulfilled its <u>Brady</u> obligation because the "memo disclosed enough of the conversation . . . to put counsel . . . on notice that favorable and possibly material evidence was available." <u>Id.</u> <u>Hooks</u> does not support the proposition that the prosecution suppresses evidence under <u>Brady</u> when information is publicly available. <u>See also</u> <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1511, 1516–17 (10th Cir. 1995) (<u>Brady</u> violated where, despite defense counsel's request, prosecution represented to defense counsel that no exculpatory evidence

(continued)

11

¶78 In line with every federal circuit, Wisconsin has historically followed Brady and its progeny. This court first applied Brady in State v. Cathey, 32 Wis. 2d 79, 145 N.W.2d 100 (1966). There, the court held that due process was not denied where the prosecution failed to disclose a prosecution crime laboratory report and the report of a doctor who examined a sexual assault victim report. Id. at 93. The court in Cathey held that the reports would have been merely cumulative, and that defense counsel was aware of sufficient facts such that he could have discovered the reports had he requested them. Id. at 94.

¶79 As the majority correctly points out but then inexplicably dispenses with, Wisconsin courts have since developed an "exclusive possession" doctrine as part of the Brady analysis. Majority op., ¶¶47-50. In State v. Cole, 50 Wis. 2d 449, 184 N.W.2d 75 (1971), the court held that Brady was not violated where the prosecution did not disclose information regarding the kind of car and gun involved in the defendant's arrest. Id. at 455-57. Citing to Justice Fortas's concurrence in Giles (386 U.S. at 101), the court concluded that the information was not in the prosecution's exclusive possession, meaning that the prosecution could not have "suppressed" the information under Brady. Cole, 50 Wis. 2d at 457 & n.10. This court again referenced a need for the prosecution to have

_____

existed even though the prosecution possessed significant and voluminous exculpatory evidence, much of which was not publicly available).

12

"possession or control" under Brady in Nelson v. State, 59 Wis. 2d 474, 479, 208 N.W.2d 410 (1973).

¶80 Since Cole this court has applied exclusive possession and control by the prosecution as a requirement in a Brady analysis, echoing federal decisions limiting the definition of "suppressed" evidence to exclude situations where the defense has access to evidence from a source other than the prosecution. See, e.g., State v. Armstrong, 110 Wis. 2d 555, 579–80, 329 N.W.2d 386 (1983) (concluding no Brady violation where prosecution failed to disclose evidence of parking ticket because defendant knew he had been ticketed and paid it, and thus prosecution did not have exclusive possession or control of evidence); State v. Sarinske, 91 Wis. 2d 14, 36, 280 N.W.2d 725 (1979) (holding no Brady violation where the alleged exculpatory evidence was testimony from two defense witnesses, and thus was not in the exclusive control of the prosecution); McLemore v. State, 87 Wis. 2d 739, 751–52, 275 N.W.2d 692 (1979) (noting that Brady not violated where the defense had access to an undisclosed transcript of an American Polygraph Association hearing of charges against a polygraph examiner); State v. Amundson, 69 Wis. 2d 554, 573-74, 230 N.W.2d 775 (1975) (holding that the prosecution did not violate Brady where it did not furnish a report generated by a witness for the defense because the prosecution did not have exclusive possession or control of it).

¶81 Thus, under Wisconsin law and in line with each federal circuit, a Brady violation occurs where: (1) favorable

evidence that is material because it is exculpatory or impeaching; (2) is willfully or inadvertently suppressed by the prosecution; (3) resulting in prejudice to the defendant. Evidence is considered suppressed, or withheld, only where the prosecution is in exclusive possession or control of the evidence in question. In the case now before the court, the prosecution would have no ability to suppress what is available as publicly accessible information on CCAP.

¶82 The parties agree that the evidence of the charges and criminal complaint against Wayerski's cellmate were favorable to Wayerski, as the evidence was impeaching. Assuming they are correct, that leaves only the issues of whether the prosecution suppressed the evidence and whether Wayerski was prejudiced. While the majority is correct with respect to prejudice, it errs significantly when overreaching to conclude that the prosecution suppressed the evidence in question. Although the court's opinion could end with its determination that no prejudice resulted here, the majority subverts 50 years of law. It specifically engages in sweeping change thereby overruling Nelson, majority op. ¶¶48-50, 65; rejecting the "reasonable diligence" test found in Carvajal, majority op., ¶51; and distinguishing State v. Randall, 197 Wis. 2d 29, 539 N.W.2d 708 (Ct. App. 1995), majority op. ¶¶52-55, 65. The majority does not actually restore Brady as it claims. Rather, it upends decades of Wisconsin jurisprudence that previously applied Brady in lockstep with the vast majority of federal courts. In so doing, it embraces an amorphous analysis, leaves less than clear

14

how it reaches for its conclusion, and thus creates confusion rather than clarity.

¶83 In analyzing Brady under its new inquiry, the majority ignores an abundance of Wisconsin and federal case law which defines when the prosecution has "suppressed" evidence contrary to Brady. Despite precedent to the contrary, it then abruptly concludes that the prosecution violated Brady when it "suppressed" the criminal complaint despite information regarding it being publicly available on CCAP. Majority op., ¶¶46, 59 & n.22. The majority is notably silent regarding its choice to disregard longstanding precedent regarding when "suppression" occurs under a Brady analysis. The majority similarly makes no mention of how the prosecution could even begin to suppress, or withhold, information about charges which was otherwise publicly available on CCAP.[6]

¶84 This newly-adopted definition of "suppression" does not comport with the majority of cases that have applied Brady. In reaching its holding, the majority ignores the circuit court's finding that the prosecution here initially learned of the pending charges against the witness by conducting a CCAP search. From there, the prosecution obtained a copy of the

---

[6] The majority seems to claim that I assert that the criminal complaint was available on CCAP. That is incorrect. Information regarding the pending charges against the inmate was available electronically on CCAP, not the criminal complaint itself. However, had the defense exercised any level of diligence after searching CCAP, it would have discovered the pending charges and been able to readily obtain the criminal complaint, as it was nevertheless a matter of public record.

15

criminal complaint against the witness. Maybe it would have been a preferred approach or otherwise required pursuant to an "open file policy" or discovery requests or obligations, that the prosecution disclose the impeaching evidence at issue, but those duties are distinct from any duty to disclose under <u>Brady</u>.

¶85 This begins to highlight the inherent problem with the majority's approach. Until today, for a <u>Brady</u> violation to occur, the exculpatory evidence would need to be in the exclusive control of the prosecution. Under the majority's definition of "suppress," the prosecution would "suppress" exculpatory evidence when it withholds favorable and material information the defense does not actually possess, even if that information is of public record and could be readily discovered with a simple internet search via CCAP or some other means. But even applying the majority's definition, how can the prosecution "suppress" something that is equally available to the defense as it is to the prosecution? If there is some line of demarcation that would prevent such an absurd result from occurring, the majority fails to draw it. The majority thus rewrites <u>Brady</u> and relevant discovery statutes not based on the rule of law, but on judicial preference. It further fails to set forth how the prosecution might comply with its new <u>Brady</u> test. Is the prosecution required to maintain an open file policy in each jurisdiction statewide? Must it advertise such an open file policy to the defense in every case and regularly update the defense on the status of the prosecution's file? Under the majority's new <u>Brady</u> test, even that may not be enough. The

16

majority fails to provide any meaningful guidance as to how the prosecution must now proceed in order to comply with, and what defense counsel should now expect, given Wisconsin's new variation of Brady. The majority need not venture into this uncharted territory, but since it chose to do so, it should attempt to provide clarity. It does not, and instead it provides confusion.

¶86 The error of the majority's new definition of when the prosecution suppresses evidence is further highlighted by the presence of other rules governing discovery and disclosures, which likely carry less severe penalties than a Brady violation. For example, under Wis. Stat. § 971.23, both the prosecution and defendant have discovery and inspection obligations. Under § 971.23(1), upon demand within a reasonable time before trial, the prosecution is obligated to disclose or allow the defendant to inspect a variety of materials and information, including a list of all of the prosecution's witnesses, any written or recorded statements made by any prosecution witness, the criminal record of any prosecution witness, and any exculpatory evidence. § 971.23(1)(d)-(f), (h). If a party violates § 971.23, the statute provides as follows:

> Sanctions for failure to comply. (a) The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance.

> (b) In addition to or in lieu of any sanction specified in par. (a), a court may, subject to sub. (3), advise the jury of any failure or refusal to disclose material or information required to be

17

disclosed under sub. (1) or (2m), or of any untimely disclosure of material or information required to be disclosed under sub. (1) or (2m).

§ 971.23(7m).

¶87 As evidenced by Wis. Stat. § 971.23, rules that govern discovery exist apart from Brady, carrying with them different standards and different penalties for violations.[7] Of course, a violation of Brady carries harsh penalties, including the judicial remedy of court-ordered suppression if the prosecution seeks to use the evidence it withheld, or even a new trial. A Brady violation is so serious that a prosecutor may even face ethical charges for allegedly violating Brady.[8] The majority thus imposes an unduly harsh burden on the prosecution in a manner that flies in the face of the Brady line of cases. It further fails to clarify the contours of its new analysis, leading to potential confusion. Brady was meant to occupy a specific and limited sphere. Brady is a distinct obligation under the law. Today the majority rewrites Brady to suit its personal preferences in order to conclude that the criminal complaint should have been turned over to the defense. The majority creates Brady violations, which once were of a unique

---

[7] In fact, the defendant here made a written request to the prosecution for materials and information under Wis. Stat. § 971.23.

[8] The Office of Lawyer Regulation has prosecuted an assistant district attorney for alleged ethical violations for failure to comply with Brady and Wis. Stat. § 971.23. See In re Disciplinary Proceedings against Sharon A. Riek, 2013 WI 81, 350 Wis. 2d 684, 834 N.W.2d 384 (per curiam).

18

and fairly specific nature, in circumstances that are now undefined.

## II

¶88 Equally perplexing is the majority's extensive reach to alter longstanding Wisconsin law where it had no need to so act. The majority applies a prejudice analysis under Brady, concluding that the pending charges and criminal complaint against the witness were not prejudicial to the defendant. Majority op., ¶¶61-62. It acknowledges that though the pending charges and criminal complaint would have served as impeachment evidence regarding the prosecution's witness, the prosecution nevertheless "provided compelling evidence of Wayerski's guilt."[9] Majority op., ¶62.

¶89 Instead, the majority took it upon itself to recreate the Brady doctrine as it believed it should be. It dispenses with the fundamental requirement that the prosecution not

---

[9] While the majority correctly concludes that there was sufficient evidence to convict Wayerski regardless of the inmate's testimony, notably, the impeachment evidence the prosecution purportedly "suppressed" under Brady would also have been cumulative to the impeachment evidence that was offered at trial. For example, the inmate was cross-examined with respect to his 20 prior convictions for misdemeanors and felonies. In addition, the inmate was cross-examined with respect to his testimony of events being influenced by access to news reports and thus fabricated. Thus, there was already evidence in the record that could have impeached the inmate. See State v. Rockette, 2006 WI App 103, ¶41, 294 Wis. 2d 611, 718 N.W.2d 269 (considering Brady and stating that "[i]mpeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable").

19

"suppress," or withhold, evidence from the defense and instead, creates confusion as to when something as serious as a Brady violation occurs. As a presumable first in the country, the majority creates a Brady violation even where the defense and the prosecution have equal access to evidence available to the public. The principle underlying Brady is fairness to both the defendant and the prosecution. As the Brady court stated, "Society wins not only when the guilty are convicted but when criminal trials are fair." Brady, 373 U.S. at 87. But the majority's new analysis veers too far from what Brady and its progeny demand, as the majority now requires the prosecution to produce any evidence, even if equally accessible to the defense.

¶90 This court must keep in mind its constitutionally confined role. I therefore question why, instead of relying on United States Supreme Court precedent, precedent from federal circuits, or our own corresponding jurisprudence, the majority now departs from the vast body of law that properly applies Brady. Though the majority expressly overrules Nelson and its progeny in an attempt to "return to the original inquiry under Brady," majority op., ¶56, it fails to define the contours of this new Brady analysis, and thus creates confusion instead of supplying clarification. That is not the court's role.

¶91 As a result, I respectfully concur in part and dissent in part.

¶92 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this opinion.

20

¶93 DANIEL KELLY, J. *(concurring in part, dissenting in part).* I join all of the court's opinion except for the piece that turns a logical impossibility into a potential violation of our state and federal constitutions. I refer, of course, to the proposition that the State "suppresses" publicly-available evidence if it does not proactively provide the information to the defendant. The State's passivity, however, cannot "suppress" information in the public domain, so there can be no Brady[1] violation. The court's contrary conclusion allows defendants to attack the constitutionality of their convictions with a logical error. Because that cannot possibly vindicate any cognizable right, I do not join that part of the court's opinion.

¶94 Most of the court's opinion, so far as it addresses the question of suppression, is devoted to dismissing over 40 years of our opinions because they contain an analysis that Brady does not. Perhaps the court is right, and our jurisprudence on this subject is not warranted and should be jettisoned as unfaithful to Brady's conclusion. But there is another possibility. Brady's holding, as is true of all holdings, arose out of the facts presented to the court. Subsequent cases will necessarily present variations on that fact pattern. A reviewing court must determine whether those patterns are so closely analogous that Brady's reasoning controls the case's disposition. It is quite possible that our

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

work over the last 40 years has been focused on discerning how greatly the facts of a case may vary before the Brady analysis does not apply. That is to say, we may have been answering a question anterior to Brady's application. And if that is true, it would be entirely unremarkable that "[t]here is no express support" for those analyses in the Supreme Court's opinion. Majority op., ¶50. Actually, it would be nothing short of astounding if we were to find that Brady endogenously answered the exogenous question of its applicability. Unsurprisingly, it didn't.

¶95 Here is the anterior question we must ask before applying Brady: Are the circumstances of the case such that the State's passivity can "suppress" evidence in the prosecutor's possession? We must ask that question specifically because of Brady's holding, which was that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). That holding rests on the unexplored assumption that the State's failure to produce information in its possession resulted in "suppression by the prosecution." It is the responsibility of every post-Brady court to explore that assumption in light of the circumstances of each individual case before deciding whether Brady's prescription applies. Our failure to accept that responsibility in this case pretermitted our analysis. And because we did not complete that task, we

2

concluded the State suppressed information in the public domain by the simple expedient of knowing it existed.

¶96 The court says its analysis is motivated by a "return to the original inquiry under Brady," majority op., ¶56, but it exhibited no curiosity at all about the nature of that inquiry, to wit, the types of circumstances that could result in the suppression of evidence. Broadly speaking, there are two——one active, the other passive. The prosecution might take active measures to make evidence unavailable to the defendant by, for example, instructing a witness not to divulge certain information, or removing evidence to a location to which the defense has no access, or by affirmatively misleading the defense about the existence of that evidence. The prosecution can achieve the same result passively, but only when the State has exclusive access to the information. In that circumstance, the prosecutor suppresses evidence by failing to produce the information to the defense. If the evidence is in the public domain, however, the prosecutor's passivity is incapable of suppressing it because its availability is entirely unaffected by the prosecutor's knowledge of its existence. In other words, a prosecutor cannot suppress something he does not control.

¶97 A little illustration can go a long way in describing why passivity cannot suppress information in the public domain. So let's consider a hypothetical case tried under two different circumstances. In the first, the local newspaper published a story containing exculpatory evidence. However, neither the defense nor the prosecution read the story prior to trial, and

so neither was aware of the evidence. In the second circumstance, everything is the same except that the prosecutor did read the story. In both variants the witnesses are the same, the evidence is the same, the arguments are the same, and the verdicts are the same. The only difference is a piece of publicly-available information residing in the prosecutor's mind in the second scenario that was absent in the first.

¶98 After conviction in the first scenario, the defense would obviously have no basis for a Brady claim because the prosecution neither knew of, nor possessed, the exculpatory evidence. But the opinion in this case would say the second variant causes a Brady violation unless the prosecutor sends a copy of the newspaper to defense counsel. However, because the evidence was equally available to the parties, the prosecutor's knowledge of its existence is neither practically nor metaphysically capable of affecting the defense's ability to access it.

¶99 And that brings the nature of the court's rule into sharper focus. The court ruled that it is constitutionally unacceptable for the State to know something that the defendant does not. So our conclusion today really isn't about the suppression of evidence; it is, instead, about differential knowledge of evidence. That is to say, the court believes the differential knowledge of a piece of information in the public domain "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . ." Brady, 373 U.S. at 88. Who knew that reading

4

the newspaper with one's morning coffee could violate a defendant's constitutional rights? Or that the extent of a prosecutor's ignorance of the world around him and the risk of a constitutionally-suspect conviction are inversely proportional?

¶100 Brady does not require, nor even suggest, that we should concern ourselves with the differential knowledge of evidence to the exclusion of its suppression. The Supreme Court based its reasoning on the assumption that, under the circumstances of that case, the prosecution's passivity combined with the parties' differential knowledge to suppress the evidence. But nothing in its reasoning suggests that passivity will always have that effect. Instead, Brady itself provides a good, real-life example of a specific type of circumstance in which passivity can cause suppression. Messrs. Brady and Boblit were separately tried for murder. Id. at 84. Mr. Brady admitted his involvement in the crime, but claimed Mr. Boblit was the killer. Id. Prior to trial, Mr. Brady's counsel asked to see all of Mr. Boblit's extrajudicial statements. Id. The prosecution provided several, but omitted the one in which Mr. Boblit admitted he killed the victim. Id. The Supreme Court's opinion does not suggest Mr. Boblit's statement was available from any source other than the state. Because the state controlled access to the information, the prosecutor's failure to fully respond to Mr. Brady's request put the evidence beyond the defendant's reach. As a result, the prosecutor's passivity suppressed the exculpatory evidence. Nothing in the Supreme Court's reasoning suggests the conclusion would be the same if

5

Mr. Boblit's statement had been recounted in a newspaper story sitting on defense counsel's doorstep.

¶101 Our precedents, the ones the court overrules today, have been asking the anterior question implicitly required by Brady's holding. They use an "exclusive possession or control" diagnostic device to determine whether prosecutorial passivity could suppress evidence. See, e.g., State v. Cole, 50 Wis. 2d 449, 457, 184 N.W.2d 75 (1971) ("Certainly defendant was aware of the kind of car and gun involved in her arrest. Therefore, this information was not 'in the exclusive possession of the State.'"); State v. Sarinske, 91 Wis. 2d 14, 36, 280 N.W.2d 725 (1979) ("Thus it appears the 'evidence' was not within the exclusive control of the state, and consequently there may have been no duty to disclose the evidence to the defendant even if the district attorney was aware of the electrical short circuit.").

¶102 The clear majority of federal court of appeals circuits have been doing the same thing, although with a slightly different diagnostic device. Of this majority, all but one ask whether the defendant, through the application of "reasonable diligence," could obtain the information not produced by the prosecutor. This rubric accomplishes the same thing as our "exclusive possession or control" inquiry. They both assess whether prosecutorial passivity could suppress evidence. See, e.g., Carvajal v. Dominguez, 542 F.3d 561, 567 (7th Cir. 2008) ("Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the

6

defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."); <u>United States v. Parker</u>, 790 F.3d 550, 561–62 (4th Cir. 2015) ("We examine this issue under the established principle that when 'exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the <u>Brady</u> doctrine.'").[2]

---

[2] A sampling of opinions from circuits that understand the state does not suppress publicly-available information by not producing it to the defense includes: <u>Lugo v. Munoz</u>, 682 F.2d 7, 10 (1st Cir. 1982) ("Since the information at issue here was available to the defense attorney through diligent discovery, we find that the prosecutor's omission was not 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" (quoting <u>United States v. Agurs</u> 427 U.S. 97, 108 (1976))); <u>United States v. Catone</u>, 769 F.3d 866, 872 (4th Cir. 2014) ("Accordingly, '[p]ublicly available information which the defendant could have discovered through reasonable diligence cannot be the basis for a <u>Brady</u> violation.'" (quoting <u>United States v. Willis</u>, 277 F.3d 1026, 1034 (8th Cir. 2002))); <u>Reed v. Stephens</u>, 739 F.3d 753, 781 (5th Cir. 2014) ("A petitioner's <u>Brady</u> claim fails if the suppressed evidence was discoverable through reasonable due diligence."); <u>United States v. Shields</u>, 789 F.3d 733, 746–47 (7th Cir. 2015) ("Evidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" (quoting <u>Ienco v. Angarone</u>, 429 F.3d 680, 683 (7th Cir. 2005))); <u>United States v. Coplen</u>, 565 F.3d 1094, 1097 (8th Cir. 2009) ("'The government does not suppress evidence in violation of <u>Brady</u> by failing to disclose evidence to which the defendant had access through other channels.'" (quoting <u>United States v. Zuazo</u>, 243 F.3d 428, 431 (8th Cir. 2001))); <u>Wright v. Sec'y, Fla. Dep't of Corr.</u>, 761 F.3d 1256, 1278 (11th Cir. 2014) ("'When the defendant has equal access to the evidence[,] disclosure is not required' and 'there is no suppression by the government.'" (quoting <u>Maharaj v. Sec'y for Dep't of Corr.</u>, 432 F.3d 1292, 1315 (11th Cir. 2005))); and <u>United States v. Derr</u>,

(continued)

7

¶103 The tests we and most of the federal court of appeals circuits have been using to diagnose the suppressive potential of prosecutorial passivity may or may not represent the ideal formulation of the inquiry. But if we are really interested in State suppression of evidence, rather than mere differential knowledge of evidence, then surely we must engage in some such diagnosis before applying Brady's prescription. Today, the court showed no interest in doing so.

¶104 Dispensing with that diagnosis makes for a decidedly odd rule. But the oddity does not derive from our constitutions, nor is it born of Brady (even though the court purports to found its rule on Brady's language). We own this idiosyncrasy, an idiosyncrasy that results from our failure to account for how passive suppression actually works. Instead of exploring Brady's unspoken assumption, the court just recapitulated its holding, stating that the Supreme Court "has discussed suppression in terms of withholding evidence." Majority op., ¶56 (citing Brady, 373 U.S. at 87 ("A prosecution

---

990 F.2d 1330, 1335 (D.C. Cir. 1993) ("Brady provides no refuge to defendants who have knowledge of the government's possession of possibly exculpatory information, but sit on their hands until after a guilty verdict is returned."). The Second Circuit has rejected the "reasonable diligence" test in favor of its own formulation: "'[E]vidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" United States v. Rowland, 826 F.3d 100, 113 (2d Cir. 2016) (quoting United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006)). Nonetheless, this formulation is not as sweeping as the "differential knowledge" standard our court adopts today.

8

that withholds evidence on demand of an accused" violates his constitutional obligations)). Yes, it has. But that doesn't advance the analysis because Brady addressed the "withholding" under circumstances that made the evidence unavailable to the defendant. Consequently, our court's analysis simply begs the question implicit in Brady's holding.

¶105 The court also offered a handful of cases that, it broadly hinted, have something to say about the duty to disclose publicly-available information. They are unhelpful. One of them, Cone v. Bell, 556 U.S. 449 (2009), offers us no guidance here because it examined Brady's "materiality" requirement, not its "suppression" component. The same is largely true of Kyles v. Whitley, 514 U.S. 419 (1995), as well. The Kyles Court broke no new ground with respect to Brady's suppression element, merely rehearsing the cases that have come before. Instead, it concentrated almost exclusively on what makes evidence "material" within the meaning of Brady and whether the duty to disclose covers information known to the police but not the prosecutor. As for Banks v. Dretke, the Court addressed Brady's suppression element no further than was necessary to dispose of the state's improbable argument that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence . . . ." 540 U.S. 668, 696 (2004). But we are addressing passive nondisclosure here, not active deceit. The Supreme Court's opinion in United States v. Agurs addressed Brady's suppression element, but only to hold that the prosecution's disclosure obligation exists

9

independently of a defendant's request for exculpatory evidence. 427 U.S. 97, 110 (1976). Because the circumstances there indicated the undisclosed evidence was not publicly available, its discussion does not touch the question we must answer. Id. at 100-101.[3] Likewise for Strickler v. Greene, 527 U.S. 263, 273 (1999). Therefore, none of these cases tell us anything about whether it is possible for the State to passively suppress publicly-available information.

¶106 So I find myself agreeing with a clear majority of the federal court of appeals circuits (specifically, the 1st, 4th, 5th, 7th, 8th, 11th, and D.C.) in concluding that, prior to applying Brady, we must diagnose whether the information the prosecutor did not produce was otherwise available to the defense. Most of the federal opinions I cited post-date all the Supreme Court cases upon which our court relies for its conclusion.[4] And yet none of the authoring circuits saw in those cases the portents my colleagues seem to see. I may be joining a fellowship of error in agreeing with these circuits, for the Supreme Court might actually address this question someday and give us our comeuppance. But that's better than being on the aggressive vanguard of an effort to arm defendants with a

---

[3] The evidence was comparable to that at issue here (i.e., a criminal record). However, what one may acquire today with a few keystrokes was effectively invisible and inaccessible to the public in 1976.

[4] All the cases, that is, that actually discussed Brady's suppression element. I don't count Cone v. Bell, 556 U.S. 449 (2009), because the opinion discussed only the materiality component of the Brady analysis.

10

logical fallacy with which to attack the constitutionality of their convictions.

¶107 Alas, the court's effective holding is that a prosecutor suppresses evidence in the public domain simply by knowing it exists. But unless we assume his solipsism, the prosecutor cannot suppress what he cannot control. Nevertheless, the new rule in Wisconsin is that a logical impossibility can make a conviction constitutionally suspect. The only other way to understand the court's decision is that the parties' differential knowledge of evidence can violate the Constitution without regard to suppression. That, however, is not Brady's rule, and neither the parties nor the court have offered the slightest rationale for expanding the Brady principle so dramatically.

\*

¶108 The evidence of pending charges against Mr. Clark was at all material times available on the Consolidated Court Automated Programs ("CCAP") system, a source of information more readily available than the local newspaper. And upon learning of the complaint against Mr. Clark, defense counsel could have

11

picked up the phone and asked for a copy.[5] If he had been told "no," then he would have had a classic <u>Brady</u> claim: "[T]he suppression by the prosecution of evidence favorable to an accused <u>upon request</u> violates due process where the evidence is material either to guilt or to punishment . . . ." <u>Brady</u>, 373 U.S. at 87 (emphasis added). But we'll never know because he never asked. And he never asked because he never looked.[6] Perhaps this inaction would be remediable under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), but it cannot say anything about whether the State violated the Constitution. It was logically impossible for the prosecutor to suppress any of the evidence at issue in this case just by looking at it. For these reasons, I respectfully join the court's opinion except for its discussion of <u>Brady</u>'s "suppression" element. On that point, I respectfully dissent.

---

[5] The court laments that "[i]f Wayerski's trial counsel had discovered the pending charges, he would have had to take extra steps to promptly secure the complaint from Chippewa County." Majority op., ¶59. And what of it? These intolerable "extra steps" would likely be nothing more than a phone call, something the prosecutor seems to have accomplished easily enough. If something truly would have stood between him and the complaint (besides a phone call), he should have told us what it was so that we might evaluate its suppressive potential. But we certainly should not suppose defense counsel was a potted plant, unable to stir himself enough to reach for information at his fingertips.

[6] If evidence of the complaint were not publicly available, the State would have been required to proactively offer it (had the information been material) under the <u>Agurs</u> rationale.

12