COURT OF APPEALS
DECISION
DATED AND FILED

November 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1893-CR**

Cir. Ct. No. 2018CF1635

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ROYCE O. BERNARD,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JOSEPH R. WALL and JEAN M. KIES, Judges. *Affirmed*.

Before White, C.J., Colón, P.J., and Donald, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Royce O. Bernard appeals his judgment of conviction entered after a jury trial where he was found guilty of felony murder as a party to a crime. He also appeals the order denying his postconviction motion without an evidentiary hearing.[1] Upon review, we affirm.

## BACKGROUND

¶2 Bernard was charged in connection with the shooting death of Michael Brown during a robbery in July 2017. Brown's partner of 40 years, Betty, told police that she and Brown were alone at their residence at the time of the home invasion, although their adult son, Melvin, had been there earlier.[2]

¶3 The home invasion occurred at approximately 3:30 a.m. Betty said she and Brown were lying in bed watching movies when two armed men entered the bedroom, demanding money. The men forced Brown and Betty to lay on their stomachs on the bed and not look at them. Betty told police that she tried to "get a quick peek" at the men, but they noticed and hit her in the head with a gun.

¶4 Betty said one of the men left the bedroom and ransacked the house. The men continued to ask for money, and then ordered Brown out of the bedroom. Betty subsequently heard one of the men direct Brown to "get up on your knees." She then heard one gun shot.

---

[1] Bernard's trial was before the Honorable Joseph R. Wall, who we refer to as the trial court. Bernard's postconviction motion was decided by the Honorable Jean M. Kies, who we refer to as the postconviction court.

[2] We follow the State's use of the deceased's name while using pseudonyms for his partner, referred to as Betty, as well as their son, referred to as Melvin. *See* WIS. STAT. RULE 809.86(4) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version.

¶5      Betty told police she waited for 20-30 minutes to make sure the men were gone. She then ran out of the bedroom, saw Brown's body on the floor, and ran to a neighbor's house to call 911. The medical examiner determined that Brown died from a single gunshot wound to the head fired at close range. Additionally, the armed intruders took two televisions and some clothing.

¶6      In March 2018, Betty attended a live lineup, but made no identification. A police detective who was assisting with the lineup noticed that Betty seemed "nervous" and "afraid"; when the lineup was concluded, the detective asked Betty if anyone in the lineup had "looked familiar," despite Betty having circled "no" on her lineup form. Betty "hesitantly" answered no. However, when the detective gave Betty a ride back to work after the lineup, Betty "blurted out" that she did recognize the person in the second position in the lineup as the person who had given the directive to shoot Brown, but was "terrified" to say anything. The person in the second position was Bernard.

¶7      Approximately eleven days later, different detectives showed Betty a photo array, using photos that were taken during the lineup so that Betty was viewing the same individuals. The detectives used pictures that did not show the numbers from the lineup positions, and ensured that Bernard was not in the second folder of the photo array, so his photo would not align with his position in the live lineup. Betty immediately identified Bernard when she saw his photo. Bernard was charged with felony murder, as a party to a crime.

¶8      Bernard filed a motion to suppress Betty's identification of Bernard, arguing that the circumstances surrounding the photo array rendered it impermissibly suggestive. After a hearing on the motion, the trial court found that Bernard had not met his initial burden of demonstrating that the photo array was

impermissibly suggestive. On the contrary, the court found the detectives had used "great care and caution" to ensure the fairness of the photo array presented to Betty after the live lineup. The court therefore denied the motion to suppress.

¶9 The matter proceeded to trial in July 2019. Betty testified regarding the robbery and shooting. She also explained that she was fearful of identifying Bernard in the lineup because she was "scared for [her] life" as the intruders had not been caught at that time, but that she had recognized the person in the second position of the lineup. Betty then identified Bernard in court.

¶10 On cross-examination, Betty was asked about the descriptions of the armed intruders she had initially provided to police after the incident. Bernard's trial counsel played the recording of Betty's interview with police, pointing out discrepancies in Betty's physical descriptions of the intruders, what they were wearing, and whether their faces were covered.

¶11 Testimony was also heard from the police officers who responded to the shooting, and the detectives who were present at the lineup and the photo array. Additionally, Bernard's sister, Shitina Hopson, testified for the State. Hopson explained that Brown and Betty's son, Melvin, is the father of her child. Hopson stated that Bernard and Arnel Collins, a co-actor who was also charged in the robbery and shooting, came to her residence on the night of the incident. She testified that Collins was "very agitated," and that she overheard Bernard and Collins discussing that something had occurred that "wasn't supposed to happen." Hopson said she believed the men had gone to Brown's residence looking for money and drugs.

¶12 The detective who had previously interviewed Hopson also testified. He stated that Hopson told him that when Bernard and Collins came to her house

on the night of the robbery and shooting, they said they had gone to Brown's residence, along with a third man, to steal drugs and money. He said Hopson provided details about the incident that were not generally known to the public. The detective further testified that Hopson had overheard the two say that Brown previously coached Collins in basketball; that one of the men used Collins' name during the robbery, which alerted Brown as to who the intruders were; and that Collins then shot Brown.

¶13 The third man involved in the robbery, Brandon Thomas, also testified. He explained that he had waited in the car when Bernard and Collins entered the house, and that both men were armed. Collins then called Thomas when they were ready for him to "come grab some things." Thomas saw Brown lying on the living room floor, with Collins pointing a gun at him. Thomas carried a television and a bag of clothes to the car. Thomas was returning to the house when he heard a gunshot. He stated he then ran back to the car, and saw Bernard and Collins run from the house. Once in the car, Thomas testified that Bernard asked Collins "[d]id you get him?" and Collins replied that he had "because he put the gun up to him."

¶14 For the defense, Bernard's friend Dajuan Hoover testified as an alibi witness. He stated that he and Bernard had stayed over at the home of Trevianna Grady, Bernard's girlfriend at the time, on the night of the shooting. Hoover testified that Bernard took him to work in the early morning hours that day—after the robbery and shooting, which occurred around 3:30 a.m. Hoover stated he was told by his employer that he was not needed that day, and that on the way back to Grady's they got pulled over by police and received a ticket. This was corroborated by evidence showing that Bernard received a ticket that day at 5:14 a.m., and that Hoover was in the car with him.

¶15     Bernard had also listed Grady as an alibi witness. However, prior to the start of trial, Bernard's counsel informed the trial court that they were unable to locate Grady.

¶16     Bernard testified in his own defense. He stated that he was at Grady's from approximately 8:00 p.m. on the night before the shooting until Hoover woke him for a ride to work. During his testimony, Bernard was asked about calls he had made from jail to Hoover and Grady. Bernard claimed that he was simply "trying to remind [his] witnesses" of the details from that night. Prior to his testimony, the recorded calls had been played for the jury, where Bernard was heard telling Hoover to make sure his and Grady's stories "match up." Bernard was also heard telling Grady to say they were at her house with Hoover, and to "pick another female's name" to assert was also there. Grady was heard saying "[y]ou're going to owe me your life … if I do this for you."

¶17     The jury found Bernard guilty of felony murder, as a party to the crime. The trial court imposed a 40-year sentence, bifurcated as 25 years of initial confinement to be followed by 15 years of extended supervision.

¶18     Bernard filed a postconviction motion listing several claims: (1) that the trial court erred in denying his motion to suppress because the photo array was impermissibly suggestive; (2) that his trial counsel was ineffective for failing to call witnesses to impeach Betty regarding discrepancies in her description of the armed intruders; (3) that counsel was also ineffective for failing to call Grady, the

other alibi witness, at trial; and (4) that the State committed **Brady**[3] violations by failing to disclose information relating to Betty's identification of Bernard.

¶19    The postconviction court rejected Bernard's claims. The court agreed with the trial court's decision denying the motion to suppress, citing Bernard's failure to meet his burden of demonstrating that the identification procedures were impermissibly suggestive. Bernard's claims of **Brady** violations, which involved the photo array presented to Betty, were also rejected by the postconviction court. Those claims included that a page was missing from the police report of the photo array that was provided to the defense, and that there was no video recording of the presentation of the photo array, in violation of police procedures. Bernard further asserted that Betty's teenage daughter's presence at the photo array suggested that she had assisted Betty in making the identification of Bernard.

¶20    In response, the State provided the full police report, showing that the page Bernard claimed was missing contained only Betty's biographical information. Additionally, the State pointed out that at the suppression hearing, the detective who testified stated that technical difficulties prevented a video recording of the photo array, so an audio recording was made instead. The State also observed that the detective had testified that Betty's daughter did not participate in the photo array. The postconviction court therefore concluded that Bernard's claims were based on "speculative assertions" relating to materials that were provided during discovery, and thus were not **Brady** violations.

---

[3] *See **Brady v. Maryland**, 373 U.S. 83 (1963).

¶21 With regard to Bernard's ineffective assistance claims, the impeachment witnesses he asserted should have been called were the neighbor who assisted Betty in calling 911 after the robbery and shooting, and the detective who interviewed Betty immediately after the incident. Specifically, Bernard pointed to Betty's descriptions of the armed intruders to these prospective witnesses, which contained discrepancies such as the height of the intruders and whether they wore masks. The postconviction court noted that Bernard's trial counsel had played a portion of Betty's recorded interview with police which included her descriptions of the intruders, and questioned Betty regarding these discrepancies. Thus, the court determined that additional testimony by these witnesses on this point would have been cumulative. Furthermore, the postconviction court was not persuaded that calling the witnesses would have been more effective than counsel's cross examination of Betty. Therefore, the postconviction court found that Bernard had not demonstrated that the testimony of these witnesses created a reasonable probability of a different outcome at trial.

¶22 Bernard's other ineffective assistance claim related to the failure to call Grady, Bernard's then-girlfriend who was his other potential alibi witness. At trial, counsel elicited testimony from Bernard that counsel, his investigator, Bernard himself, and other friends of Bernard had tried to contact and locate Grady prior to trial, to no avail. The postconviction court found that counsel could not be deemed to be ineffective for failing to present testimony from an unwilling witness. The court further noted the evidence of the recorded jail calls revealing Bernard's attempt to fabricate an alibi with Grady and Hoover. Therefore, the court found there was not a reasonable probability that Grady's purported testimony would have changed the outcome of the trial.

¶23    Accordingly, the postconviction court denied Bernard's postconviction motion without a hearing.  This appeal follows.

## DISCUSSION

¶24    On appeal, Bernard seeks either a new trial or an evidentiary hearing based on his postconviction claims.  The postconviction court has the discretion to deny a hearing "if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief[.]"  *State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.  We review such discretionary decisions under the erroneous exercise of discretion standard.  *Id.*

*Motion to Suppress*

¶25    We first review Bernard's claim that the trial court erred in denying his motion to suppress Betty's identification.  In reviewing a trial court's decision on a motion to suppress, we review the trial court's findings of fact, upholding them unless they are clearly erroneous, and independently review "the application of constitutional principles to those facts[.]"  *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.

¶26    For the evaluation of an identification process, the defendant must first "meet an initial burden of showing that the identification procedure employed by law enforcement was impermissibly suggestive such that there was a very substantial likelihood of misidentification."  *State v. Roberson*, 2019 WI 102, ¶¶34, 82, 389 Wis. 2d 190, 935 N.W.2d 813.  If the defendant meets that burden, the burden then shifts to the State to demonstrate that "under the 'totality of the

circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.*, ¶¶35, 82 (citations omitted).

¶27    We conclude that Bernard failed to meet his burden of showing the identification procedure was impermissibly suggestive. *See id.*, ¶34. As described above, the record reflects that Betty's hesitancy to identify Bernard in the live lineup was clearly due to her extreme fear from the incident. In fact, at the suppression hearing, the detective described Betty as "one of the most terrified and scared witnesses/victims of a homicide investigation that I have been a part of in the last five years."

¶28    Furthermore, the trial court noted the "great care and caution" taken by the detectives who prepared the photo array to ensure its fairness. These precautions included using photos of the same individuals who were in the live lineup, and placing Bernard's picture in a folder other than the second folder so as to not align with his second position in the live lineup. The trial court found the detective's testimony at the suppression hearing to be "very, very credible."

¶29    The record further reflects that Betty made a definitive identification of Bernard after the live lineup, and during the subsequent photo array. It also suggests that Betty may have been familiar with Bernard, given that her son Melvin has a child with Bernard's sister.

¶30    "[R]eliability [i]s the linchpin in determining the admissibility of identification testimony." *Id.*, ¶3 (citation omitted). The record supports a finding that Betty's identification of Bernard was reliable and, as such, the findings of the trial court are not erroneous. Indeed, the circumstances surrounding the identification do not establish that there was a substantial likelihood that Betty

misidentified Bernard. *Id.*, ¶34. We therefore conclude that the trial court did not err in denying Bernard's motion to suppress. *See Eason*, 245 Wis. 2d 206, ¶9.

***Brady* Claim**

¶31 We next address Bernard's claim that the State committed ***Brady*** violations, as this claim is also related to Betty's identification of Bernard. Under ***Brady***, a defendant "has a due process right to any favorable evidence 'material either to guilt or to punishment' that is in the State's possession[.]" ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 (quoting ***Brady v. Maryland***, 373 U.S. 83, 87 (1963)). This court "independently review[s] whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." *See **Wayerski***, 385 Wis. 2d 344, ¶35.

¶32 To establish a ***Brady*** violation, it must be shown that (1) the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either "willfully or inadvertently"; and (3) the evidence was material. ***Wayerski***, 385 Wis. 2d 344, ¶35.

¶33 Bernard's arguments relating to ***Brady*** revolve around the photo array from which Betty identified Bernard. First, he claims that the third page from the police report relating to the photo array was missing from the discovery provided to the defense. In response to Bernard's postconviction motion, the State—while not conceding that the page was missing from discovery—attached the full report, including page three, which contains nothing more than Betty's biographical information. Even if this page was inadvertently not included in discovery, Bernard fails to explain how this information is exculpatory, useful for

impeachment purposes, or material to Betty's identification of Bernard. *See Wayerski*, 385 Wis. 2d 344, ¶35.

¶34 Next, Bernard contends that video from the photo array is "missing." As stated in the police report and confirmed during the suppression hearing, technical issues prevented a video recording of the photo array from being made, so an audio recording was made instead. Furthermore, the detective who testified at the suppression hearing stated that a video recording of a photo array is not required under standard police procedures.

¶35 Nevertheless, Bernard suggests that the missing page of the report and the failure to record the photo array on video is "suspicious" and, as such, supports his theory that Betty's teenage daughter, who accompanied her to the photo array, participated in the identification. Bernard asserts that Betty's identification was not based on her own personal knowledge; she had mentioned to the detective in the car that the "word on the street" was that Bernard had been involved in the robbery and homicide and was in the lineup, and that her children knew the shooter's nickname. Thus, Bernard contends that Betty's daughter may have assisted her in identifying Bernard. Bernard also points to the use of "they" in the report of the photo array to support his contention that the daughter participated in the photo array.

¶36 However, the detective testified at the suppression hearing that the daughter did not participate in the photo array, recognizing that it would not have been considered a "valid array" if someone had assisted Betty with her identification. As noted above, the trial court found the detective's testimony to be very credible. It was also established at the hearing that police officers, as well

as prosecutors, routinely use "they" instead of gender-specific pronouns to protect the identity of an individual or informant.

¶37    Based on the record, we conclude that no **Brady** violation occurred with respect to Betty's identification of Bernard from the photo array. *See Wayerski*, 385 Wis. 2d 344, ¶35. Indeed, we agree with the postconviction court's observation that Bernard's claims are based on "speculative assertions" relating to materials that were provided during discovery. Accordingly, his **Brady** claim fails.

*Ineffective Assistance of Counsel*

¶38    We next discuss Bernard's claims of ineffective assistance of counsel for failing to call several witnesses. Our analysis of an ineffective assistance of counsel claim involves the familiar two-pronged test: the defendant must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." *State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶39    To prove that counsel was constitutionally deficient, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. To prove prejudice, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The court need not address both prongs

of the test if the defendant "cannot make a sufficient showing" on one. ***State v. Mayo***, 2007 WI 78, ¶61, 301 Wis. 2d 642, 734 N.W.2d 115.

¶40    Bernard first asserts that counsel was ineffective for failing to call two witnesses for impeachment purposes: the neighbor who assisted Betty with calling 911 after the incident, and the detective who interviewed Betty immediately after the incident.  Bernard contends that testimony from these witnesses could have emphasized the discrepancies in Betty's descriptions of the armed intruders.

¶41    As the postconviction court pointed out, and as the record reflects, Bernard's trial counsel cross-examined Betty regarding these discrepancies, playing an audio recording of her statement to police.  Therefore, the testimony of these witnesses would have been cumulative.  As a result, we are not persuaded that there is a reasonable probability that calling these witnesses would have affected the outcome of the trial. *See **Strickland***, 466 U.S. at 694.

¶42    We also reject Bernard's claim that counsel was ineffective for not pursuing Grady as an alibi witness.  On the contrary, the record indicates that Bernard named Grady as an alibi witness, and made numerous attempts to locate her to testify at trial.  We are therefore not persuaded that counsel's efforts fell below an objective standard of reasonableness. *See **id.*** at 688; *see also **State v. DeLeon***, 127 Wis. 2d 74, 86, 377 N.W.2d 635 (Ct. App. 1985) (explaining that trial counsel cannot be blamed for a witness's "lack of cooperation").  Furthermore, given the evidence relating to the jail calls by Bernard to Grady, which suggest an attempt to fabricate an alibi, we conclude that there is not a reasonable probability that Grady's testimony would have affected the outcome of the trial. *See **Strickland***, 466 U.S. at 694.

14

¶43 We also note the overall strength of the State's case against Bernard. In particular, Bernard's sister, Hopson, provided testimony regarding details of the robbery and shooting that she overheard from Bernard and Collins that night, which corroborated Betty's version of events, and was supported by testimony from the police detectives involved as well as the testimony of Thomas, the third man who participated in the robbery and shooting. Under these circumstances, Bernard has not demonstrated that, but for the purported errors he alleges, the outcome of the trial would have been different. *See id.* Therefore, for all of these reasons, Bernard's ineffective assistance of counsel claims fail.

## CONCLUSION

¶44 In short, because all of Bernard's claims fail, the postconviction court did not err in denying his motion without an evidentiary hearing. *See Allen*, 274 Wis. 2d 568, ¶9. Accordingly, we affirm his judgment of conviction and the order denying his postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.